[No. S107508. July 8, 2010.]

In re ALFREDO REYES VALDEZ on Habeas Corpus.

COUNSEL

Marilee Marshall, under appointment by the Supreme Court, for Petitioner Alfredo Reyes Valdez.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon, Sharlene A. Honnaka and Carl N. Henry, Deputy Attorneys General, for Respondent State of California.

OPINION

MORENO, J.—On May 22, 1992, petitioner Alfredo Reyes Valdez was sentenced to death for the April 30, 1989 murder of Ernesto Macias. On June 14, 2002, while the automatic appeal to this court was pending, Valdez filed a petition for writ of habeas corpus. On January 6, 2004, in the automatic appeal, we affirmed the judgment of death in *People v. Valdez* (2004) 32 Cal.4th 73 [8 Cal.Rptr.3d 271, 82 P.3d 296].

On November 17, 2004, we issued an order to show cause why relief should not be granted on the ground that trial counsel rendered ineffective assistance of counsel. On February 7, 2007, following the filing of a return and reply, we ordered the Los Angeles Superior Court to appoint a referee to conduct an evidentiary hearing and make findings on several questions. Judge Charles E. Horan was appointed and, following an evidentiary hearing, filed his referee's report on December 4, 2008, answering each question and concluding that petitioner did not establish that trial counsel rendered ineffective assistance of counsel.

Having considered the parties' briefs and exceptions to the referee's report, for the reasons that follow we adopt the referee's report and deny the petition for writ of habeas corpus.

## FACTS

A jury convicted petitioner of first degree murder (Pen. Code, § 187, subd. (a))[1] and escape from custody (§ 4532, subd. (c)) and found true the special circumstance allegation that the murder was committed while petitioner was engaged in the commission of a robbery (§ 190.2, subd. (a)(17)) and the allegation that petitioner personally used a firearm (§§ 12022.5, subd. (a), 1203.06, subd. (a)(1)). The jury also found that petitioner had previously suffered three serious felony convictions. (§ 667, subd. (a).)

*Evidence Admitted at Trial*[2]

*Guilt Phase*

The victim, Ernesto Macias, lived in Pomona in a house that he shared with his cousin Arturo Vasquez. On the Saturday night before the victim was murdered, Gerardo Macias, who was a distant relative of the victim, arrived to pick up Rigoberto Perez, who had been drinking beer with the victim, Vasquez, and petitioner. Gerardo[3] and Perez were cousins and lived together with Gerardo's mother.

When Gerardo entered the house, the victim, Vasquez, Perez, and petitioner were in the small living room, which also served as the bedroom. The victim was lying on a mattress, covered with blankets, and had a Jennings .22-caliber semiautomatic handgun at his side. Perez was lying on a second mattress, with Vasquez sitting next to him. Petitioner was standing near the front door. The victim announced he wanted to go to sleep because he was leaving early in the morning to catch a plane to Mexico to attend his sister's wedding. He said he was taking $3,000 with him.

Gerardo, who had been drinking beer that day, drank one or two more beers after he arrived. Approximately 10 minutes later, at Vasquez's suggestion, Gerardo, Vasquez, and Perez drove to the nearby house of a friend, Andreas "Pato" Gutierrez, to "party," leaving the victim and petitioner alone. As they were leaving the house, Gerardo heard the victim tell petitioner in

---

[1] All further undesignated statutory references are to the Penal Code.

[2] This portion of the statement of facts is taken largely from our opinion in the automatic appeal. (*People v. Valdez, supra,* 32 Cal.4th 73.)

[3] Because Gerardo Macias has the same last name as the victim, we will refer to him by his first name.

Spanish, using a "kind of mad" voice, to wait outside, but Gerardo did not see petitioner leave the house.

It took the three men approximately one minute to travel to Gutierrez's house, but they found that Gutierrez was preparing to go to sleep, so they returned to the victim's house to drop off Vasquez. The round trip took approximately 10 minutes. Gerardo drove into the driveway of the victim's house and Vasquez got out of the car and walked up to the front door. When Vasquez opened the door, no one was inside; he saw a lot of blood and yelled, "Hey, hey." Perez got out of the car and joined Vasquez at the door. Visibly frightened, they ran back to the car and told Gerardo that they had seen "all kinds of blood." Because it was the victim's house, and the victim had had a gun beside him when the three men last saw him, they thought the victim might have shot petitioner.

The three men drove around the area looking for the victim and petitioner. After quickly checking with a cousin of the victim, who lived "down the street," Gerardo drove around the block a couple of times, and finally noticed a bloody body lying on the curb a few houses away from the victim's house. Gerardo was unable to identify the body, but Vasquez recognized it as the victim's. Gerardo drove around the block to a telephone booth, dialed 911, and reported the location of the body. He then drove Vasquez to Gutierrez's house, drove himself and Perez home, and did nothing further. He testified that he did not wait for the police because he was frightened and had outstanding arrest warrants.

Pomona Police Sergeant David Johnson entered the victim's house on Sunday, April 30, 1989, with two other officers and observed "blood every-where." A broken trail of blood and bloody bare footprints led from the victim's concrete front porch to the victim's body. The victim was not wearing shoes and his feet were bloody. Detective Frank Terrio surmised that the victim had left the bloody footprints when he walked out of his house bleeding to death.

The victim had been shot four times. An entry wound just below the victim's left eye likely had been fatal, and a wound below the right ear indicated that the victim had been shot from less than 18 inches away. It was possible that the victim had sustained the injuries inside the house and collapsed some distance away.

The victim's left pants pocket was turned inside out and there were bloodstains on the interior of the pocket. He was wearing jewelry and approximately $80 was found in his undisturbed right pants pocket. The prosecution introduced the victim's 1988 state and federal tax forms, which

claimed a federal tax refund of $1,203. Two days before the murder, on Friday, April 28, 1989, a United States Treasury check for $1,203 payable to the victim had been cashed at a Bank of America branch office in Pomona. Given the bank's policy of requiring two forms of identification to cash a check, a bank manager opined that the victim had cashed the check. A police check and credit fraud expert compared signatures on the victim's Department of Motor Vehicles handwriting exemplar with that on the treasury check. The signatures were similar, but the analysis was inconclusive.

Detectives searched the victim's house and discovered a Jennings .22-caliber semiautomatic handgun underneath the kitchen sink, one expended .22-caliber long rifle cartridge casing, one .22-caliber "Super X" long rifle cartridge, and one .25-caliber cartridge. The Jennings .22-caliber handgun fires .22-caliber long rifle ammunition and holds a total of seven rounds. They did not find a wallet, money, plane tickets, or a bank savings book.

Detective Terrio also observed two different shoe prints made in blood on the concrete porch outside the victim's house. It was clear that the same shoe had not made both prints. One of the shoe prints, which was consistent with those made by Adidas jogging shoes or Nike walking shoes, was only a partial print of the midsole area, and thus could have been made while the person was entering or leaving the house. The larger shoe print indicated that it had been made while the person was leaving the house. Detective Terrio testified on cross-examination that the two shoe prints were consistent with two people having left prints in the blood. He also acknowledged that a police officer at the scene could have left one of the prints, but noted that officers generally do not wear tennis shoes to crime scenes. A police work boot, however, exists that has a pattern similar to the one found on the porch.

Approximately 24 hours after the murder, in the early morning hours of May 1, 1989, Pomona Police Lieutenant Larry Todd was monitoring a group of individuals who were not implicated in the murder investigation but were suspected of preying on people visiting certain convenience stores. He observed the group near a Monte Carlo automobile parked outside one of the targeted convenience stores. Petitioner was standing next to the passenger side door of the car. Intending to warn the occupants of the vehicle about the group, Lieutenant Todd drove up to the Monte Carlo. As he did this, the driver of the vehicle got out and walked to the front of the car. Lieutenant Todd got out of his patrol vehicle and walked toward the driver. When he reached the driver's side door of the Monte Carlo, he spotted a small-caliber gun protruding from under the front seat. He pulled out his weapon and ordered the driver and petitioner to stand still.

Lieutenant Todd called for assistance and was joined by Officer Joseph Pallermino who seized the gun, a Jennings .22-caliber semiautomatic hand-gun, and a magazine containing bullets, from the driver's side interior of the car. The three bullets seized consisted of two Super X .22-caliber long rifle cartridges, and one Federal .22-caliber long rifle cartridge.[4] Officer Pallermino noticed dried blood on the grip of the gun. Petitioner and the driver of the car, who was identified at trial only as Morales, were arrested. When petitioner was booked, he had $100 in cash on his person. It was stipulated that petitioner was unemployed at the time.

Detective Terrio, who is a latent print expert, compared a bloody palm print that was detected on the left side of the grip of the Jennings .22-caliber handgun found in the Monte Carlo to petitioner's palm print. In Detective Terrio's opinion, the latent palm print was made by petitioner, and could only have been made when the blood was wet. On cross-examination, Detective Terrio stated that he could not determine the age of the print, and agreed that petitioner's palm print might have gotten on the grip of the gun without petitioner gripping the gun while shooting it. Deputy Sheriff Linda Arthur, a latent fingerprint expert with the Los Angeles County Sheriff's Department, opined, but was not sure, that the palm print was from a left hand.

Serologist Richard Catalani examined the blood on the grip of the Jennings .22-caliber handgun found in the Monte Carlo and compared it to blood from the victim and petitioner. Catalani opined that the blood on the gun could not have come from petitioner, but was consistent with the victim's blood type. He added that approximately 16.4 percent of the population has the same phosphoglucomutase (PGM) subtype as the blood found on the gun.

Criminalist James Roberts examined the bullets removed from the victim's body to determine whether they could have been fired from the Jennings .22-caliber handgun found in the Monte Carlo or the identical Jennings .22-caliber handgun found in the victim's kitchen. He stated that he was unable to conclusively link the bullets to either gun because the bullets could have been fired from any Jennings .22-caliber semiautomatic handgun.

On April 19, 1990, about a year after the murder, Pomona Police Detectives Allen Maxwell and Greg Collins interviewed petitioner. Petitioner waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], but refused to allow the interview to be tape-recorded.

---

[4] Seven Super X .22-caliber long rifle cartridges, along with one Federal .22-caliber long rifle cartridge, were subsequently found in the Monte Carlo.

Petitioner admitted that he had been at the victim's house around the time the victim was killed, and recalled that there had been three other people in the house that evening. He had gone to the victim's house "quite often" to buy drugs, but he did not buy any that night because the victim had said he did not have any drugs to sell. Initially, petitioner said he had left the victim's house shortly after the other three men left, but then said he had left the house at the same time as the others. He said he had argued with the victim as to whether he should leave, but maintained their argument was not violent. Petitioner stated he did not have a gun while he was at the house.

Petitioner told the officers that the day after the murder he went to a convenience store to buy beer. When he came out of the store, officers were detaining Morales. Feeling that he had nothing to fear, he walked up to the car and was subsequently arrested.

When questioned further about the Monte Carlo, petitioner gave contradictory answers as to how he and Morales had obtained the car. Petitioner first said he had gone with Morales to the apartment of the owner of the Monte Carlo, and even though the owner did not like him, the owner had lent them his car. Petitioner then said Morales had gone to the owner's apartment, borrowed the Monte Carlo, drove around the corner, picked up petitioner, and the two of them drove around looking for drugs.

Petitioner told the detectives that he had not known there was a gun in the Monte Carlo and did not know how his bloody print got on the gun. He said he never touched the gun.

When questioned about inconsistent and confusing statements he made during the interview, such as how he and Morales had obtained the Monte Carlo, petitioner became "[d]efensive [and e]xtremely agitated." The interview ended when petitioner became upset over questioning regarding both his inconsistent statements and his print on the gun found in the Monte Carlo.

On April 8, 1991, while in custody on unrelated charges, petitioner appeared in court and pleaded not guilty to the murder and special circumstance charges. While being escorted back to "lock up" in a "four-man chain," petitioner broke free from his handcuffs and fled out of the courthouse. Deputy marshals and sheriffs pursued him and subsequently found him hiding in a women's bathroom in a building across the street.

Petitioner did not testify, but Vasquez testified for the defense that on the day of the murder, or the day before, he had loaned a Jennings .22-caliber handgun to Gutierrez that was identical to the guns found under the victim's kitchen sink and seized from the Monte Carlo. Sometime in the afternoon, the

victim, carrying a suitcase, left saying his brother Roberto was going to take him to the airport to catch a flight to Mexico. Vasquez spent the afternoon drinking beer at the house with Perez and Gutierrez.

The victim unexpectedly returned home at approximately 9:00 p.m. Gutierrez went home after approximately one hour, but petitioner arrived, soon followed by Gerardo and Perez, who were a "little bit drunk." Vasquez did not see the victim with a plane ticket, a wallet, cash, or luggage upon his return. Nor did he notice a bulge in the victim's pants pockets. Vasquez never heard the victim brag about having large sums of money or discuss his trip to Mexico. The victim and petitioner were friendly to each other and did not argue. Vasquez, however, admitted on cross-examination that he had concentrated more on a television program than on the conversation between the victim and the others, and further admitted he was a "little drunk."

Petitioner remained in the house with the victim when the three men left. The victim was wrapped in a blanket on his mattress near the television and petitioner was sitting next to Vasquez's mattress. Vasquez, like Gerardo, testified that the trip to Gutierrez's house was short, both spatially and temporally, and that they returned to the victim's house because Gutierrez was preparing to go to bed. His testimony was consistent with Gerardo's testimony regarding the discovery of the victim's body.

It was stipulated at trial that: (1) petitioner is right-handed; (2) if the victim's brother were called to testify, he would say the victim gave a gun to Gutierrez on the evening of April 29, 1989; and (3) Gutierrez owed the victim about $250 and the victim needed the money "so that he could attend a wedding in Mexico and have more money with him."

The defense also introduced evidence that on April 14, 1989, approximately two weeks before the murder, nine cases of Jennings .22-caliber semiautomatic handguns, a total of 324 guns, had been stolen from a truck in Pomona. The guns found in the Monte Carlo and in the victim's kitchen were among the stolen guns.

Detective Greg Guenther testified for the defense that he arrived at the crime scene at approximately 3:30 in the morning and, while surveying the scene, noticed shoe impressions left in dry dirt in the side yard of the victim's house. The impressions seemed to lead toward the alley north of the victim's house. Detective Guenther pointed out that the prints did not seem to originate from the porch area because there was a gap between the porch and where the prints began. He further opined that anyone walking in the area could have left the shoe prints. He did not try to make a visual comparison of the prints left in the dirt to the prints that were left on the concrete porch. The

prosecution subsequently called Detective Terrio on rebuttal regarding the shoe impressions in the side yard. He testified that the yard functioned as an access area and there was evidence of a lot of foot traffic, but "there was no fresh footprint evidence or anything that seemed significant."

At some point later in the investigation, Detective Guenther became aware of witness statements indicating that the victim had given a gun to Gutierrez. But he stated that there were no reports of any search or attempted search of Gutierrez's house in pursuit of that gun.

### Penalty Phase

### Prosecution Evidence

The prosecution presented evidence that petitioner had been convicted in Texas of aggravated robbery on January 28, 1983, and had been convicted in California of five counts of first degree residential burglary on August 3, 1983. Petitioner had committed four violent acts while in prison and jail. The first incident occurred on May 8, 1984, at Deuel Vocational Institution in Tracy, California. Correctional Officer Steven Espinoza observed an inmate, who was wearing a black bandana, stab a fellow inmate while another inmate held the victim. Once the victim fell to the ground, the inmates walked across the prison yard and mingled with another group of inmates who were lined up against a wall because an alarm had sounded. Officer Espinoza approached the group of inmates and noticed that petitioner was wearing a black bandana. He took and reported petitioner's prison number. Officer Espinoza, however, could not positively identify petitioner as the assailant and he did not know if petitioner was charged, disciplined, or reprimanded for the stabbing. The victim suffered head injuries and stab wounds, and had blood coming out of his ear. Two "inmate manufactured stabbing weapons" were subsequently found under a pallet near the wall where petitioner and the other inmates had been standing. Officer Donald Karvonen also discovered a bloody "state jacket" and sweatshirt in the yard. Although he testified that two inmates were the subject of a disciplinary report, he did not believe anyone was found culpable.

The second incident occurred on September 22, 1984, in Soledad prison. Correctional Officer Steve Valentine saw petitioner chasing another inmate with a metal baseball bat. Petitioner ignored Officer Valentine's order to drop the bat, and continued chasing the other inmate. Officer Valentine called for assistance and gave chase. Petitioner stopped running and threw down the bat only after a tower gunman "chambered" his weapon as a warning and ordered petitioner to halt. Petitioner later said he had intended to beat the other inmate to death because the inmate had "disrespected" him.

The third incident occurred on March 10, 1991, while petitioner was in jail in Los Angeles. With the help of other inmates, petitioner assaulted fellow inmate Javier Rodriguez and took a bag containing $80. Petitioner punched Rodriguez three times in the face with a closed fist, while the other inmates kicked him.

The fourth incident occurred on October 21, 1991, while petitioner was in county jail. Deputy Sheriff Douglas Shive observed petitioner walk "straight towards" inmate William Robinson. Robinson was "backpedaling" with his hands in the air and looked "extremely scared." Deputy Shive intervened and searched petitioner, finding a 10-inch shank in his pants pocket. There was blood on Robinson's T-shirt and puncture wounds on his arm and back. While he was being detained, petitioner told Deputy Shive, "I don't have anything against you. I'm not after you."

The prosecution also presented evidence that on January 18, 1991, petitioner met with Francisco Banuelos at petitioner's apartment. Petitioner told Banuelos that he had some tires he wanted to sell. Banuelos replied that he wanted to buy the tires, but because he only had $100 he would perhaps buy them the next day. Banuelos then agreed to give petitioner a ride in his truck. When they reached their destination, they got out of the truck and walked toward a garage. At that point, petitioner grabbed Banuelos by the hand, put a knife to his chest, and demanded that Banuelos give him the $100 and the keys to the truck. Banuelos handed petitioner the money and keys and ran away.

Later that day, Pomona Police Officer Bradley Elliot spotted petitioner sitting in the driver's seat of Banuelos's truck. As the officer approached, petitioner and another man got out of the truck and ran. After a chase, petitioner was caught and handcuffed following a 30- to 40-second struggle with three police officers.

With respect to the April 8, 1991 courtroom escape, the prosecution offered evidence that petitioner kicked and struck Los Angeles County Deputy Sheriff John Guise when he attempted to apprehend petitioner.

### Defense Evidence

Petitioner's father, Antonio Valdez, testified for the defense that petitioner was born in Mexico and was 10 years old when he moved with his family to Pomona. Petitioner had two brothers, one of whom had died, and two sisters. He dropped out of school at the age of 14 or 15 and worked with his father. Petitioner was obedient and respectful to his parents and was a good worker. Mr. Valdez thought that perhaps petitioner took the wrong path because life

was very hard in Pomona. Mr. Valdez told the jury his wife was very ill and was near death. He said that if petitioner was sentenced to death, "I don't believe that my wife will live."

Rosa Valdez, petitioner's mother, testified that the family was poor and she worked all of her life. She did not believe petitioner committed the murder and asked the jury for "mercy for my son." Victoria Valdez, petitioner's sister, testified petitioner was helpful with her children and had not been a violent child. She asked the jury to sentence him to life without the possibility of parole. Petitioner's other sister, Graciela Valdez, testified that petitioner was not a violent person and felt that he should not be sentenced to death because she needed to speak to him for advice.

Leticia Belmar, petitioner's aunt, lived in Mexico when petitioner was born and took care of him on a daily basis when he was a child. He was well behaved and attended church. She told the jury that when petitioner was six or seven years old, he spent money that his mother had given him on toys for the baby Belmar was expecting. She testified further as to petitioner's generous nature as a child and also told the jury that when petitioner was eight years old, he had saved a child from drowning. She did not want petitioner to receive the death penalty.

Enedina Garcia and her husband, Jose Garcia, were petitioner's friends. Enedina Garcia had known petitioner and his family for 17 years, and said she had never seen petitioner act violently. She was aware of petitioner's prison record, but believed he had become religious while in prison. She asked the jury to spare petitioner from the "gas chamber." Jose Garcia testified he had spoken with petitioner about religion and that petitioner had helped keep his children out of trouble. He had never observed petitioner with a gun and said that petitioner should be sentenced to life without the possibility of parole.

Carolina Reyna, another close friend, testified that she did not think petitioner was capable of killing anyone and never saw petitioner behave in a violent manner. Even though petitioner's father always yelled at him and his siblings, petitioner listened and obeyed. She believed petitioner could help others even if he remained in prison for the rest of his life.

James Park, a retired correctional officer with the California Department of Corrections, who once served as an associate warden at San Quentin, described general housing conditions for inmates serving sentences of life without the possibility of parole. Park explained that an inmate sentenced to life without the possibility of parole would "most certainly go to one of the . . . four maximum security level 4 prisons." He testified that the security

at these prisons was impregnable and that searches were conducted frequently to minimize possession and use of weapons. Prisoners who violate any rules are sent to security housing units and spend up to 23 hours a day in a cell. Park said that he opposed the death penalty and had seen first-hand the irrevocability of the gas chamber.

### Prosecution's Rebuttal

Robert Leach testified that he had been working for the California Department of Corrections for 27 years and currently worked in a level 4 maximum security unit. He stated that a person who is sentenced to life without the possibility of parole is given enough points to be housed in a level 4 unit, but does not necessarily stay at level 4 throughout his stay in state prison. When an inmate seems to be doing well, the prisoner's points can drop and the prisoner can become a level 3 and enjoy all the advantages of that classification. In his experience, inmates frequently make weapons and assault each other.

It was stipulated that if Roger Kumar, petitioner's parole agent, were called to testify, he would state that petitioner's parole terminated on February 13, 1989, and that petitioner remained unemployed throughout his almost 12-month parole period.

### Petition for Writ of Habeas Corpus

Valdez's petition for writ of habeas corpus raised 13 issues, which included numerous subissues. We granted an order to show cause on claim IV, subclaims A, B, H, and I, which alleged that trial counsel rendered ineffective assistance of counsel at the guilt and penalty phases of his trial by (1) failing to introduce at the guilt phase DNA evidence that he had in his possession and failing to call witnesses to testify that the blood on the pants found in the Monte Carlo did not come from the victim, (2) failing to make an adequate offer of proof at the guilt and penalty phases regarding third party culpability evidence regarding Liberato Gutierrez, who was found in the alley behind the victim's house with spots of blood on his boots and clothing, and (3) deciding not to present a mitigating case at the penalty phase revolving around petitioner's abusive home environment and drug abuse and to have petitioner examined by a mental health professional.

Pursuant to our direction, the Presiding Judge of the Los Angeles County Superior Court appointed Judge Charles E. Horan to sit as a referee in this proceeding, hold an evidentiary hearing, and make findings on the following questions:

1. Why did petitioner's trial counsel not introduce evidence at the guilt phase of the trial that the blood on the pants seized from the Monte Carlo automobile had been tested by the prosecution and found not to have come from the victim and did this reason constitute a reasonable tactical choice by trial counsel?

2. Why did petitioner's trial counsel not attempt to introduce at the guilt phase of the trial the proffered evidence regarding Liberato Gutierrez to show that Gutierrez may have murdered and/or robbed the victim and did this reason constitute a reasonable tactical choice by trial counsel?

3. Did petitioner's trial counsel provide ineffective assistance of counsel by failing to adequately investigate and present evidence in mitigation during the penalty phase as alleged in subclaim H of the petition?[5]

4. Why did petitioner's trial counsel not attempt to introduce at the penalty phase of the trial the proffered evidence regarding Liberato Gutierrez to show that Gutierrez may have murdered and/or robbed the victim and did this reason constitute a reasonable tactical choice by trial counsel?

*Referee's Report*

Following an evidentiary hearing, Judge Horan submitted a 108-page referee's report that begins by summarizing the testimony given by 13 witnesses. In response to question 1, the referee concluded that petitioner's trial counsel made a reasonable tactical choice not to introduce evidence that blood on the pants seized from the automobile petitioner was standing next to when he was arrested did not come from the victim. In response to question 2, the referee concluded that petitioner's trial counsel made a reasonable tactical choice not to introduce evidence that Liberato Gutierrez may have murdered and/or robbed the victim. In response to question 3, the referee concluded that petitioner's trial counsel, in one respect, failed to adequately investigate whether there was evidence in mitigation, but did not provide ineffective assistance of counsel because petitioner had failed to show that significant mitigating evidence existed. Finally, in response to question 4, the referee concluded that all of the considerations that led trial counsel to make a reasonable tactical choice at the guilt phase not to introduce evidence that Liberato Gutierrez may have murdered and/or robbed the victim applied equally to the penalty phase, although trial counsel did not, in fact, reconsider the issue during the penalty phase.

---

[5] The referee correctly observed that this court generally refrains from asking referees whether an attorney provided ineffective assistance of counsel, because that question necessarily includes the determination of prejudice, which is an issue to be decided by this court. (*In re Ross* (1995) 10 Cal.4th 184, 215 [40 Cal.Rptr.2d 544, 892 P.2d 1287].) Accordingly, we have considered the referee's factual findings, but have made our own determination of whether prejudice resulted.

## DISCUSSION

■ Petitioner claims he was deprived of his right to counsel under the Sixth Amendment to the federal Constitution and article I, section 15 of the California Constitution because his trial attorney was ineffective. " '[T]he right to counsel is the right to the effective assistance of counsel.' " (*Strickland v. Washington* (1984) 466 U.S. 668, 686 [80 L.Ed.2d 674, 104 S.Ct. 2052].) "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Ibid.*) ■ "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a break-down in the adversary process that renders the result unreliable." (*Id.* at p. 687.)

To make the required showings, petitioner must show that his attorney's "representation fell below an objective standard of reasonableness" "under prevailing professional norms" (*Strickland v. Washington, supra,* 466 U.S. at p. 688; see *In re Hardy* (2007) 41 Cal.4th 977, 1018 [63 Cal.Rptr.3d 845, 163 P.3d 853]) and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome" (*Strickland v. Washington, supra,* 466 U.S. at p. 694). "This second part of the *Strickland* test 'is not solely one of outcome determination. Instead, the question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." [Citation.]' [Citation.]" (*In re Hardy, supra,* 41 Cal.4th at p. 1019.)

■ "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances

of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" (*Strickland v. Washington, supra,* 466 U.S. at p. 689.)

In making this determination, we give great weight to the referee's findings that are supported by substantial evidence. (*In re Hardy, supra,* 41 Cal.4th at p. 993.) "The deference accorded factual findings derives from the fact that the referee had the opportunity to observe the demeanor of witnesses and their manner of testifying." (*In re Marquez* (1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435].) We do not defer, however, to the referee's conclusions of law: "The referee's conclusions of law are subject to independent review, as is his resolution of mixed questions of law and fact. [Citations.] 'Mixed questions "include the ultimate issue, whether assistance was ineffective, and its components, whether counsel's performance was inadequate and whether such inadequacy prejudiced the defense." ' [Citation.]" (*Ibid.*)

### Blood on the Pants Seized from the Automobile

On cross-examination by petitioner's trial counsel, Anthony Robusto, Detective Terrio testified that he noticed "trace amounts of blood" on a pair of gray pants and a piece of vinyl that he discovered in the passenger compartment of the Monte Carlo automobile petitioner was standing next to when he was arrested. The prosecutor asked no questions about these items. During closing argument, defense counsel referred to the pants and the vinyl and stated: "So what you have is a pair of gray pants that have blood on them . . . . You know that there are bloodstains—or they have some trace blood on them. You know there's a piece of vinyl with some trace blood on it. [¶] But you don't know anything about that blood, you know nothing about it, whether it was analyzed, whether it was compared, whether any of that was done. [¶] Wouldn't it be interesting if it had been analyzed and been consistent with—the way the gun was consistent with—the PGM type of [the victim]?" Later, defense counsel returned to this theme, stating: "You know that there is bloody pants in the car, gray pants. You know that those pants are not analyzed. You know that the vinyl is not analyzed." In her closing argument, the prosecutor agreed that there was no evidence that the blood on the pants belonged to the victim, stating: "Now if the blood was consistent with that of the victim don't you think you would have known that?"

Petitioner alleged that he was deprived of effective assistance of counsel because his attorney failed to present evidence that the blood on the gray

pants had been analyzed and determined not to have come from the victim. Petitioner provided as an exhibit a report from Cellmark laboratory stating that DNA testing had been performed on the blood on the pants and on a sample of the victim's blood, which showed that the blood on the pants did not come from the victim. Petitioner claimed that effective counsel would have offered this evidence because "[c]ounsel could have then argued that it was reasonable to assume that if the blood on the pants did not belong to [the victim] the blood on the gun did not belong to him either."

At the reference hearing, Trial Counsel Anthony Robusto explained why he did not introduce the DNA evidence showing that the blood on the gray pants did not belong to the victim. In September of 1991, five months before trial commenced on March 2, 1992, petitioner spontaneously admitted to Robusto that he had "shot and killed" the victim. Robusto replied, "You're kidding," petitioner said "No," and Robusto terminated the conversation, saying, "I don't want to hear anymore." Petitioner had earlier admitted to Robusto, in May of 1991, prior to the preliminary hearing, that the gun seized from the Monte Carlo was his and he had lied about it because he was on parole and "did not want to get tagged with the gun."

Prior to trial, Robusto had obtained a copy of the Cellmark report stating that the blood on the gray pants found in the Monte Carlo did not match the DNA of the victim's blood. Because the blood on the gun had only been tested for blood type, which showed only that the victim was among 16 percent of the population with that blood type, Robusto agreed that, in theory, he could have argued that the blood on the gray pants, which did not belong to the victim, was also the source of the blood on the gun. But because petitioner had confessed to Robusto that he had shot and killed the victim, Robusto did everything he could "to prevent the prosecution from testing that blood on the gun with DNA testing" because he "believe[d] the probability is that it's going to come back positive DNA for [the victim], which is only going to hurt my client . . . ."

■ The referee concluded "that Robusto's decision not to introduce the test results of the blood on the pants constitutes a reasonable tactical choice." We agree. As the referee stated: "Robusto believed that if he signaled his intention to call witnesses to demonstrate that the blood on the pants was not that of the victim, the prosecution might not simply conduct PGM subtyping on the pants, but test the gun as well, and this time use DNA technology. Robusto had every reason to believe that this testing would virtually prove that the victim was the donor of the gun blood."

*Evidence That Liberato Gutierrez Murdered or Robbed the Victim*

In the automatic appeal, petitioner contended that the trial court erred by excluding evidence relating to third party culpability. Defense counsel made an offer of proof at trial that Detective Guenther would testify that when he arrived at the crime scene, he noticed shoe prints leading toward an alley north of the victim's house and learned that officers were detaining a group of individuals who had been discovered in the alley. Detective Guenther noticed that one of the individuals, Liberato Gutierrez,[6] was "extremely nervous [and] his hands were shaking." He arrested Liberato Gutierrez after observing a spot of blood on his shirt, and two spots on one of his work boots.

The prosecution objected, arguing in part that defense counsel was trying to show "that Liberato Gutierrez could be the murderer in this case." Defense counsel emphatically disagreed, explaining that his purpose was to attack the thoroughness of the police investigation: "The purpose of bringing up Liberato Gutierrez, the blood and the shoes, is not what the People are articulating in any shape, fashion or form. . . . It is not pointing a finger at Mr. Liberato Gutierrez and saying you're the killer, you're the one that took the money. That's not the issue. The issue has to do with whether or not these 12 people can believe and rely upon the investigation that was performed by the Pomona Police Department as well as the Sheriff's Department. [¶] And it's important for them to have that information and for them to evaluate that information."

The trial court sustained the prosecution's objection, ruling: "The court finds that the probative value of that testimony is outweighed by the necessity of the undue consumption of further time. It would create a substantial danger of confusing the issues and of misleading the jury. [Detective Guenther] will not be permitted to testify in that area. I am not restricting the testimony as to other areas." On appeal, we held that the trial court did not abuse its discretion in light of petitioner's offer of proof, which "was not directed at eliciting testimony that Liberato Gutierrez was the person responsible for killing or robbing the victim, but rather was aimed at a general attack on the police investigation . . . ." (*People v. Valdez, supra,* 32 Cal.4th at p. 109.) Detective Guenther was permitted to testify that when he arrived at the crime scene, he was informed that a group of people had been discovered in an alley north of the victim's residence and were detained and interviewed.

Petitioner now claims he was denied effective assistance of counsel because his trial counsel, Robusto, failed to make an adequate offer of proof

---

[6] Liberato Gutierrez is not related to Andreas "Pato" Gutierrez. For the sake of clarity, Liberato Gutierrez will be referred to by his full name.

that the proffered testimony of Detective Guenther should have been admitted to prove that Liberato Gutierrez might have murdered or robbed the victim.

At the reference hearing, Robusto explained why he did not offer Detective Guenther's testimony to prove that Liberato Gutierrez may have killed or robbed the victim. Robusto knew that he could not actually prove that Liberato Gutierrez had killed the victim, because petitioner had confessed to Robusto that he had done so. Petitioner also had told Robusto that he had never met Liberato Gutierrez and Gutierrez had not been at the victim's residence prior to the murder. Robusto did not want the spots of blood observed on Liberato Gutierrez's shirt and boots to be tested because he was certain that the blood did not come from the victim, and he did not want to cause the prosecutor to order further DNA analysis because she might also order additional testing of the blood on the handle of the gun found in the Monte Carlo, which Robusto was certain had come from the victim.

Although Robusto wanted to inform the jury that other people had been found in the vicinity following the crime, which he was permitted to do, he did not want to assert that Liberato Gutierrez might have killed or robbed the victim, because the People easily could have refuted that claim, which would have harmed Robusto's credibility before the jury. Robusto knew that Liberato Gutierrez's fingerprints were not found at the crime scene, that he had a blood-alcohol level above 0.30 percent and could barely walk, that he had been drinking all day with his companions, and that the soles of his shoes did not match the shoe prints at the scene of the crime.

The referee concluded that Robusto had made a reasonable tactical choice. We agree. Robusto reasonably concluded that the evidence that Liberato Gutierrez had killed or robbed the victim was weak and would have been easily refuted by the prosecution. He reasonably concluded that testing the spots of blood observed on the clothing of Liberato Gutierrez would not have been helpful, because he was reasonably certain the blood did not come from the victim, and could have been quite harmful, because it could have triggered DNA testing of the blood on the gun, which Robusto was reasonably certain came from the victim.

### Evidence Regarding Liberato Gutierrez at the Penalty Phase

Petitioner further contends that Robusto was ineffective in failing to ask the court to reconsider its ruling at the penalty phase and permit Detective Guenther's testimony to show that Liberato Gutierrez might have killed or robbed the victim in order to establish lingering doubt in the minds of the jurors. Robusto testified at the reference hearing that he did not remember whether he considered asking the court at the penalty phase to admit further

evidence relevant to lingering doubt. The referee found that had Robusto considered whether to ask the court to reconsider its ruling, the same considerations that led Robusto to reasonably conclude not to attempt to prove at the guilt phase that Liberato Gutierrez killed or robbed the victim would have applied equally at the penalty phase. We agree that Robusto was not ineffective in failing to ask the court to reconsider its ruling at the penalty phase. The same tactical considerations Robusto relied upon at the guilt phase would have made it equally fruitless and risky to contend at the penalty phase that Liberato Gutierrez might have killed or robbed the victim.

### Mitigating Evidence at the Penalty Phase

Petitioner contends that Robusto failed to adequately investigate and present evidence in mitigation at the penalty phase.

As noted above, at the penalty phase of the trial, Robusto called as witnesses five members of petitioner's family and three family friends. Petitioner's father, Antonio Valdez, described petitioner as a good worker who was obedient and respectful to his parents. Petitioner's mother, Rosa Valdez, and his two sisters, Victoria and Graciela Valdez, pled for mercy for petitioner and described him as not violent. The same was true for petitioner's aunt, Leticia Belmar, and his friends Enedina and Jose Garcia. No one testified that petitioner was abused as a child. To the contrary, family friend Carolina Reyna testified that even though petitioner's father always yelled at him and his siblings, petitioner listened and obeyed.

A markedly different account of petitioner's childhood emerged at the reference hearing. Rosa Valdez testified that her husband, Antonio, had subjected petitioner to a pattern of severe physical abuse. Rosa[7] testified that Antonio had "a drinking problem" and would physically abuse her, sometimes in front of petitioner. Rosa stated that her husband hit petitioner "all the time." Petitioner told Rosa that when he was a small boy, his father would make him kneel in the sun while holding stones in his hands. When petitioner was 10 or 11 years old, his father beat him with a utility cable.

As a child, petitioner worked at night with his mother and older brother, Antonio, Jr., cleaning offices. They would arrive home at 3:00 or 4:00 a.m. and Rosa would wake the boys at 7:00 a.m. to go to school. One day, the boys left school to find a place to sleep. When their father found out, he beat them with a pool cue. When petitioner was about 16 years old, he worked at a restaurant his parents owned, washing dishes. One day, his father took from him a burrito he was eating and beat him with a frying pan.

---

[7] Because they share the same surname, the members of petitioner's family will sometimes be referred to by their first names.

Rosa stated that she never reported Antonio's conduct to the police because she was afraid of him. When asked why she never took the children to a doctor after these beatings, she first answered, "I don't know," and then explained in response to a further question that she did not think they needed medical attention. A short time later, however, Rosa said that after Antonio beat petitioner with the pool cue, petitioner was "bedridden for three days without being able to move at all with fever."

Rosa testified that Robusto never interviewed her prior to trial, saying that the first time she met him was in court. When asked whether she ever told Robusto that petitioner had been abused by his father, she replied, "I forgot." She said that if Robusto had asked her while she was testifying about petitioner "being mistreated by his father," she would have answered those questions. Rosa recalled telling Robusto that Antonio had hit petitioner on one occasion when petitioner refused to attend school, but stated that conversation took place in the hallway outside the courtroom.

Carolina Reyna testified at the reference hearing that she was a family friend and described petitioner's father as a violent alcoholic who would verbally and physically abuse his children. When petitioner was 15 years old, his father hit him with a bat. Reyna stated that, prior to her testimony at trial, Robusto interviewed her at petitioner's family's home. Rosa was present but her husband was not. Robusto did not ask her if petitioner's father had molested her child, and it did not occur to her to mention it. Reyna told Robusto that Antonio yelled at petitioner but did not tell him Antonio had hit petitioner, explaining, "I didn't go into specifics because he didn't ask me those questions." Reyna was reminded that she was asked at trial if she had seen petitioner interact with his parents and answered, "He had a few problems with his father." When asked, "What type of problems?" she answered that petitioner's father "would always yell at him." Reyna explained at the reference hearing that she did not mention that Antonio had beat petitioner with a baseball bat because defense counsel "didn't ask me and I did not know I was to say all that," adding that she "was afraid to speak out."

Graciela Gamp (Graciela Valdez at the time of trial), petitioner's younger sister, testified at the reference hearing that her father verbally abused her but never struck her. Antonio was often drunk and would sometimes slap Rosa. When she was seven or eight years old, and petitioner was 15 or 16 years old, she saw Antonio hit petitioner on the back "with a two-by-four." Petitioner was unable to move the next day, and Gamp fed him cereal through a straw. Petitioner left home after that. Gamp stated that Robusto never interviewed her and never came to her family's house. When she testified during the trial, she did not mention that her father had physically abused petitioner because she "didn't think it was relevant."

Victoria Valdez, petitioner's other sister, testified that her father treated her well and struck her only once, but he struck Rosa and her brothers more often, especially petitioner, whom he struck almost every day. She recalled that when petitioner was around 11 years old, her father hit petitioner with "a two-by-four" so badly that he could not move afterwards and had to "drink from a straw." He ran away from home after that. When petitioner was seven years old, Antonio punished him for stealing a jar of pennies by burning his hands. Antonio also "hung [petitioner] up in the garage" and beat him with a cord. Perez stated that Robusto never interviewed her prior to or during petitioner's trial and never came to her family's house.

In 1998, six years after petitioner's conviction, his father was convicted of raping a relative and was sent to prison. Carolina Reyna testified that Antonio had also molested her child when the child was six years old.

Robusto testified that he has been an attorney for more than 30 years and has practiced solely criminal law for more than 20 years; petitioner's was the third capital case in which he was involved. Prior to trial, he interviewed each of the witnesses who testified for the defense at the penalty phase, including petitioner's mother and Carolina Reyna, and no one said that Antonio had physically abused petitioner. To the contrary, Rosa Valdez, with whom Robusto spoke at least six times, three times at her home, said petitioner had a good, loving relationship with his family, including his father. Robusto told Rosa that it was important for him to hear not only the good things about petitioner's family, but the bad as well. Robusto asked Rosa if plaintiff had had problems with his father, and Rosa stated there had been no problems. Rosa told Robusto that Antonio had struck petitioner once when petitioner was 16 or 17 years old, causing petitioner to leave home for one year. The family, including Rosa, "downplayed" the incident and described it as an "isolated event." Robusto checked petitioner's school record and saw nothing that indicated petitioner had been abused. Petitioner described his relationship with his family as "good." Robusto asked petitioner if he ever had been abused by his father, and petitioner answered, "no."

Dr. Nancy Kaser-Boyd, a clinical psychologist, examined petitioner in 2002 and testified at the reference hearing that petitioner told her that Antonio had repeatedly beaten him, burned his hands, and hung him in the garage. As a result, petitioner suffered from "complex post traumatic stress syndrome" at the time of the murder.

Dr. Kyle Boone, a clinical psychologist, conducted a neuropsychological assessment of petitioner in 2007 and testified at the reference hearing that petitioner has "low average" intelligence and reads at a 10th-grade level. He shows evidence of brain dysfunction, primarily in the frontal lobes, which decreases his ability to comply with the law.

In his report, the referee found credible Attorney Robusto's assertion that, prior to trial, he specifically asked petitioner if his father or anyone else had abused him and petitioner replied in the negative. The referee further concluded that petitioner's denial was truthful. The referee found that, prior to trial, Robusto "interviewed many of the witnesses now claiming to have witnessed abuse" and asked them about petitioner's relationship with his family, but none "revealed any abuse other than one beating allegedly inflicted upon petitioner by his father." The referee described as "unconvincing" the witnesses' denial that Robusto had asked them whether petitioner had been abused and concluded that the witnesses' explanations for not mentioning the abuse when they testified at the penalty phase were "implausible." After summarizing the testimony of each of the witnesses, the referee found that "petitioner has failed to prove his allegations of child abuse. Likewise, he has failed to prove that he ever developed PTSD [(posttraumatic stress disorder)], or that he suffers from brain damage/dysfunction, or cognitive impairment." The referee noted that petitioner "*has* demonstrated by a preponderance of the evidence that his father hit him on one occasion and that he thereafter ran away from home." The referee concluded: "In short, petitioner has failed to carry his burden of proving that substantial mitigating evidence existed at the time of his trial." The referee concluded that Robusto's penalty phase preparation "was reasonable, if not exhaustive, and that the reason no abuse was uncovered was that none had occurred."[8]

The referee's findings are supported by substantial evidence and we adopt them. The record before us provides convincing reasons to suspect the veracity of the claims by petitioner's family and friends that he was repeatedly physically abused by his father, but that no one mentioned it while testifying at the penalty phase or when speaking to Robusto because Robusto failed to ask. We accept the referee's finding that Robusto interviewed each of the witnesses who testified at the penalty phase and asked them to share both the bad and the good about petitioner's relationship with his family. We also accept the referee's finding that Robusto specifically asked petitioner whether he had been abused by his father or anyone else, and that petitioner denied having been abused. Petitioner has failed to show that Robusto failed to adequately investigate and present evidence in mitigation at the penalty phase.

---

[8] The referee found that trial counsel's representation was deficient in one respect, because counsel "inexplicably failed to conduct a thorough interview of petitioner relative to the crime itself," but further concluded that petitioner "failed to offer any evidence as to what petitioner *would have* told [trial counsel] if asked to provide the details surrounding his commission of the murder." Petitioner, thus, has failed to demonstrate prejudice.

## CONCLUSION

The order to show cause is discharged and the petition for writ of habeas corpus is denied.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.