Filed 2/1/16  P. v. Garcia CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ARTHUR GARCIA,<br><br>    Defendant and Appellant. | B257247<br><br>(Los Angeles County<br>Super. Ct. No. BA355012) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Affirmed as modified.

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Nima Razfar, Deputy Attorney General, for Plaintiff and Respondent.

_____

Arthur Garcia appeals from the judgment entered following his conviction by a jury of attempted murder and assault with a firearm with true findings he had personally discharged a firearm causing great bodily injury to Laveil Hunter. Garcia contends his counsel provided ineffective assistance because he failed to properly object to admission of testimony Garcia had been seen with a gun about a month before the incident and the court engaged in prejudicial misconduct by actively questioning witnesses. We affirm with a modification to reflect the People's failure to prove a prior prison term enhancement.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Information*

Garcia was charged by amended information with attempted premeditated murder (Pen. Code, §§ 187, subd. (a), 664) and assault with a firearm (Pen. Code, § 245, subd. (a)(2)). It was specially alleged Garcia had personally discharged a firearm causing great bodily injury (Pen. Code, § 12022.53, subd. (d)), had suffered a prior serious felony conviction (robbery) within the meaning of Penal Code section 667, subdivision (a), and the three strikes law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12) and had served a prior separate prison term for a felony conviction (felon in possession of a firearm) (Pen. Code, § 667.5, subd. (b)). Garcia pleaded not guilty and denied the special allegations.

### 2. *Summary of the Evidence Presented at Trial*

#### a. *Elizabeth Ramirez's testimony*

Elizabeth Ramirez testified Laveil Hunter asked her if she had any change as she was entering a liquor store around 10 p.m. on March 29, 2009. She said no. After Elizabeth[1] left the store, Hunter again asked her for change. Elizabeth told him she did not have any; and Hunter began cursing at her, using racial slurs and threatening that he could kill her. Elizabeth, scared, drove home. When she arrived a few minutes later, her brother Raphael was there with Garcia and Pablo Renteria. Raphael got angry when

---

[1]     Because Elizabeth Ramirez and her brother Raphael Ramirez share a surname, we refer to them by their first names for convenience.

Elizabeth told him what had happened and asked her to drive him to the liquor store so he could talk to Hunter. Garcia and Renteria said they would also go. Raphael rode in the front passenger seat of the car.

Elizabeth dropped the three men off across the street from the liquor store and drove home. Although Elizabeth initially testified she did not hear anything as she drove away, when she was asked whether she had told police detectives she heard gunshots, she explained she heard "some kind of pops," but did not know if they were gunshots. Over defense counsel's "speculation" objection, Elizabeth further testified she had seen Garcia with a gun about a month earlier at a party her brother and his friends were having; but she was not able to identify whether it was a revolver or a semiautomatic handgun.[2]

The jury was shown surveillance footage from cameras recording the front of the liquor store and the street alongside it and was presented with still photographs taken from the video footage. The video footage showed Elizabeth's car stop across the street from the liquor store. A man in a dark jacket walked quickly from the passenger side of the car around the rear of it, crossing the street toward Hunter, with another man following shortly behind him. Just as the first man reached the sidewalk with the second man at about the middle of the street, a third man, wearing a white shirt, left the car from the rear passenger door on the driver's side. As the first two men got closer to Hunter, he began to run; the third man was in the middle of the street waiting for a car to pass. After the car passed, the third man ran across the street and shot in the direction Hunter had run. (A muzzle flash can be seen.) Elizabeth identified her brother as the first man in the dark jacket walking toward Hunter. She could not distinguish which of the other two men was Garcia or Renteria.

---

[2]     Although the record is not clear, it appears defense counsel's objection may have been based on a statement Elizabeth made to detectives that she had "never really seen" Garcia with guns. In response to follow-up questions, however, Elizabeth told detectives she saw Garcia show a gun to Raphael at a party. The court, describing Elizabeth's statement as "pretty specific," permitted the prosecutor to ask her whether she had previously seen Garcia with a gun.

3

b. *Hunter's testimony*

Hunter acknowledged he had asked Elizabeth for change when she left the store, but testified he had never used racial slurs, threatened or cursed at her. When Elizabeth said she did not have any change, a man who had come out of the store with her said, "No and fuck you." Hunter responded "fuck you" to the man, and Elizabeth told Hunter "not to talk to her homeboy like that."[3] A few minutes later, according to Hunter, "Two dudes drove up on me, told me what I was doing messing with their homeboy, and I started running." Although the surveillance video appears to show Hunter looking toward Elizabeth's car when it drove up and as the men left it, he testified he did not see where the men had come from because "I had my back turned, when I turned around there was two of them coming from . . . a side street." As Hunter ran, he heard seven or eight gunshots. One of the shots struck him in the back of the leg.

Hunter testified he had seen the men before in the neighborhood. Additionally, during an interview when he was in the hospital, Hunter identified Garcia and Renteria from a photographic lineup. In the "photo identification report" Hunter wrote, "The picture 1B [Elizabeth] is the one that was driving the car when they shot me. Number 4B [Renteria] 3A [Garcia] were in the car when they shot me." However, at trial Hunter was unable to identify Garcia as one of the men who had accosted him. He also testified he did not see the man who shot him because he was running away.

c. *Detective Rose's testimony*

Los Angeles Police Detective Eric Rose, who investigated the shooting incident, testified he interviewed Renteria at the Newton Division station. During that interview Renteria told Rose that he and Raphael had chased Hunter and that it was Garcia who had shot him. Rose also testified Renteria did not claim he had been the shooter.

---

[3]     Elizabeth testified she did not know the man, but had seen him before around the liquor store.

### d. *Renteria's testimony*

Renteria testified he shot Hunter. He contended he had been socializing with some friends, although he did not know their names, and went to the liquor store because "I got pound for whoever got shot, you know." He testified he did not recognize anyone in the court room. He also claimed the only other person in the car was a woman whose name he did not know. He denied telling police detectives he and Raphael had chased Hunter and Garcia shot him. When the prosecutor asked him questions about the surveillance footage, Renteria said, "Man, I'm not going to tell you nothing else. I already told you what I had to tell you, man, and I ain't going to say nothing else, man." During cross-examination Renteria acknowledged he had pleaded guilty to assault with a firearm in connection with the incident and was serving a seven-year sentence. He also agreed he would be labeled a snitch if he gave the police a statement incriminating other people and that snitches get punished, even in state prison.

### e. *The defense theory of the case*

Garcia did not testify or present any other witness testimony. His primary defense theory was that Raphael, who was most upset by the threat to his sister, shot Hunter and that Garcia did not know Raphael intended to shoot him or else Garcia would not have run so closely after Hunter, putting Garcia in the line of fire. Garcia's attorney argued Renteria had so clearly lied that nothing he said, including his statement to detectives that Garcia had shot Hunter, could be trusted. In contrast, Hunter was a very credible witness, and the fact he had identified Garcia and Renteria strongly suggested Raphael was the shooter: "Who are the two faces that he's able to identify seven or eight days later in the hospital? Mr. Renteria and Mr. Garcia. Both of those people were the people who were approaching him, who were running towards him. He got shot by the third person who was across the street with a gun and he was the person who had the most motive to want to hurt Mr. Hunter."

### 3. *The Verdict and Sentence*

The jury found Garcia guilty of attempted premeditated murder and assault with a firearm and found true the special allegations he had personally discharged a firearm

5

causing great bodily injury. After the trial court in a separate proceeding found true the special allegation that Garcia had suffered a prior serious felony conviction, it sentenced him for attempted murder to an indeterminate term of life with a minimum parole eligibility of seven years doubled to 14 years pursuant to the three strikes law, plus a consecutive 25-year-to-life term for personally discharging a firearm causing great bodily injury, plus five years for the prior serious felony conviction enhancement. The court imposed and stayed sentence on the assault with a firearm conviction.

## DISCUSSION

1. *Counsel's Failure To Object Under Evidence Code Section 1101 to the Admission of Testimony Garcia Had Previously Been Seen with a Gun Was Not Ineffective Assistance of Counsel*

a. *Legal principles governing ineffective assistance of counsel*

The right to counsel guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution "'includes, and indeed presumes, the right to effective counsel. . . .'" (*People v. Blair* (2005) 36 Cal.4th 686, 732.) "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984) 466 U.S. 668, 686 [104 S.Ct. 2052, 80 L.Ed.2d 674]; accord, *In re Valdez* (2010) 49 Cal.4th 715, 729.)

"'To establish ineffective assistance of counsel under either the federal or state guarantee, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant.'" (*In re Roberts* (2003) 29 Cal.4th 726, 744-745; accord, *In re Crew* (2011) 52 Cal.4th 126, 150; see *Strickland v. Washington*, *supra*, 466 U.S. at p. 694.) "'The burden of sustaining a charge of inadequate or ineffective representation is upon the defendant. The proof . . .

6

must be a demonstrable reality and not a speculative matter.'" (*People v. Karis* (1988) 46 Cal.3d 612, 656; accord, *People v. Vines* (2011) 51 Cal.4th 830, 875.)

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Strickland v. Washington*, *supra*, 466 U.S. at p. 689; see *People v. Gamache* (2010) 48 Cal.4th 347, 391; *People v. Carter* (2003) 30 Cal.4th 1166, 1211.) On a direct appeal a conviction will be reversed for ineffective assistance of counsel only when the record demonstrates there could have been no rational tactical purpose for counsel's challenged act or omission. (*Gamache*, at p. 391; *People v. Anderson* (2001) 25 Cal.4th 543, 569; *People v. Lucas* (1995) 12 Cal.4th 415, 442.)

b. *Legal principles governing evidence of uncharged misconduct*

California law has long precluded use of evidence of a person's character (a predisposition or propensity to engage in a particular type of behavior) as a basis for an inference that he or she acted in conformity with that character on a particular occasion: Evidence Code section 1101, subdivision (a),[4] "prohibits admission of evidence of a

---

[4]    Evidence Code section 1101, subdivision (a), provides, "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

7

person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) Indeed, "'[t]he rule excluding evidence of criminal propensity is nearly three centuries old in the common law.'" (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.) Evidence Code section 1101, subdivision (b),[5] clarifies, however, that this rule "does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ewoldt*, *supra*, 7 Cal.4th at p. 393; accord, *People v. Leon* (2015) 61 Cal.4th 569, 597-598; see *Falsetta*, at p. 914 ["the rule against admitting evidence of the defendant's other bad acts to prove his present conduct [is] subject to far-ranging exceptions," citing Evid. Code, § 1101, subd. (b)].)

      c. *Counsel's performance did not fall below an objective standard of reasonableness because the testimony was not clearly inadmissible under Evidence Code section 1101*

Garcia's attorney unsuccessfully attempted to prevent introduction of Elizabeth's testimony she had seen Garcia with a gun about a month before the incident by objecting it was "speculation."[6] We cannot determine why he did not also object it was impermissible character evidence, which his appellate counsel asserts would have

---

[5]    Evidence Code section 1101, subdivision (b), provides, "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

[6]    Determining whether Garcia was the shooter was not necessary to find him guilty of attempted premeditated murder. As the court properly instructed the jury, Garcia could be found guilty if he aided and abetted the perpetrator who had directly committed the crime. However, only the individual who actually discharged the firearm is subject to the enhancement alleged pursuant to Penal Code section 12022.53, subdivision (d) (personal discharge of a firearm causing great bodily injury or death).

8

presented a better ground for excluding the testimony; but on this record we cannot say the failure to do so constituted ineffective assistance.

As Garcia suggests, "[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056; see *People v. Cox* (2003) 30 Cal.4th 916, 956, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) But as Justice Traynor explained for the Supreme Court in *People v. Riser* (1956) 47 Cal.2d 566, 577, disapproved on other grounds in *People v. Chapman* (1959) 52 Cal.2d 95, 98 and *People v. Morse* (1964) 60 Cal.2d 631, 648, "When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon." (See *Cox*, at p. 955 [trial court properly admitted evidence three guns had been found in defendant's truck even though cause of death was unknown; prosecutor allowed to show defendant had "'instruments that would allow him to overpower and cause the death of these young girls'"]; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1052 [witness's testimony defendant told her he kept a gun in his van was relevant and admissible as circumstantial evidence he committed the offenses]; see also *People v. Lane* (1961) 56 Cal.2d 773, 785 [admission of guns found in abandoned truck not relevant to the homicide "per se" but as weapons "of a character which could be used in armed robbery . . . in furtherance of the criminal plan"].)

Here, there was no evidence as to the type of handgun Garcia showed Raphael—Elizabeth testified she did not know the difference between a revolver and a semiautomatic weapon and at best thought the handgun might have been silver—and the prosecution did not rely on any specific type of handgun as having been used in the crime. Thus, the gun Elizabeth saw could have been the firearm used to shoot Hunter;

9

and Garcia's access to, and prior possession of, a gun was relevant circumstantial evidence he was the shooter, not simply an aider-and-abettor of the aggravated assault.[7] The link between the handgun Elizabeth saw and the weapon used in the shooting was, of course, tenuous. But defense counsel's failure to object under Evidence Code section 1101 simply did not rise to the level of a "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 687.)[8] Indeed, "'[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.'" (*People v. Carrasco* (2014) 59 Cal.4th 924, 985; accord, *People v. Salcido* (2008) 44 Cal.4th 93, 172.)

 2. *The Trial Court Did Not Commit Prejudicial Misconduct by Attempting To Clarify Witnesses' Testimony and Control the Pace of the Proceedings*

 Garcia contends the trial court committed prejudicial misconduct by unnecessarily participating in the examination of witnesses. Garcia recounts several examples of the court questioning each of the witnesses, primarily during direct examination, and argues the court's repeated intervention suggested it was allied with the prosecution. This claim has been forfeited and, in any event, lacks merit.

---

[7] Even if only minimally probative, the danger of undue prejudice by admission of the testimony was equally minimal. All evidence that tends to prove guilt is damaging or prejudicial to the defendant's case; the "prejudice" referred to in Evidence Code section 352 "'applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Firearm possession today is commonplace. Evidence of it does not evoke an inappropriate emotional bias against a defendant as an individual.

[8] We do not believe it would have been an abuse of discretion to overrule an objection to this portion of Elizabeth's testimony under Evidence Code section 1101, subdivision (a). Nor do we believe defense counsel's failure to request a limiting instruction under CALCRIM No. 375 was prejudicial under the *Strickland* standard. (See fn. 7, above.)

10

a. *Law governing judicial misconduct*

The due process clause of the Fourteenth Amendment requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of the case. (See *Bracy v. Gramley* (1997) 520 U.S. 899, 904-905 [117 S.Ct. 1793, 138 L.Ed.2d 97].) Judicial misconduct occurs when a trial judge strongly suggests to the jury he or she disbelieves the defendant's case or otherwise favors the prosecution. (See *Liteky v. United States* (1994) 510 U.S. 540, 555-556 [114 S.Ct. 1147, 127 L.Ed.2d 474]; see *People v. Houston* (2012) 54 Cal.4th 1186, 1219 ["court commits misconduct if it creates the impression that it is denigrating the defense or otherwise allying itself with the prosecution"].) To violate a defendant's right to a fair trial, the judge's intervention must be significant and adverse to a substantial degree. (See *McBee v. Grant* (6th Cir. 1985) 763 F.2d 811, 818; see also *Duckett v. Godinez* (9th Cir.1995) 67 F.3d 734, 740.)

In *People v. Sturm* (2006) 37 Cal.4th 1218 (*Sturm*) the Supreme Court summarized the California standard for judicial misconduct: "'[T]he court has a duty to see that justice is done and to bring out facts relevant to the jury's determination.' [Citation.] . . . However, 'a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant.' [Citation.] [¶] Trial judges 'should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.' [Citation.] A trial court commits misconduct if it '"persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge."'" (*Id.* at pp. 1237-1238.)

b. *Garcia's claim has been forfeited*

Garcia has forfeited his claim of judicial misconduct because he failed to object on this ground during trial. (See *Sturm, supra,* 37 Cal.4th at p. 1237 ["[a]s a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial"].) Garcia argues any objection would have been futile and no admonition could have cured the prejudice, thus his claim is cognizable on appeal.

11

(See *ibid.* [finding it would have been futile for defendant to object to the judge's derogatory comments and objections where it could cause the judge to be more negative toward defendant in front of the jury].)  Garcia, however, fails to support his contention with any reasoned argument.  The court did not in its questioning of witnesses display hostility, frustration or animus toward defense counsel or the defendant; and there was no apparent risk that an objection might further anger or frustrate the court reflecting negatively on the defendant.  Indeed, Garcia concedes defense counsel and the trial judge had a "long-term professional acquaintance" and defense counsel, who was "professional and polite" could have "forthrightly but professionally opposed the court's appearance of favoritism toward the prosecution's case."  Significantly, Garcia acknowledges "it may be that this manner of conducting the trial was the particular style of this particular Judge."  These are precisely the circumstances in which an objection is necessary:  The court was plainly unaware its attempts to facilitate examination and the pace of trial might have created a perception of bias.

c. *Even if not forfeited, Garcia's claim lacks merit*

"A trial court has both the discretion and the duty to ask questions of witnesses, provided this is done in an effort to elicit material facts or to clarify confusing or unclear testimony." (*People v. Cook* (2006) 39 Cal.4th 566, 597; see Evid. Code, § 775 ["[t]he court, on its own motion or on the motion of any party, may call witnesses and interrogate them the same as if they had been produced by a party to the action, and the parties may object to the questions asked and the evidence adduced the same as if such witnesses were called and examined by an adverse party"]; *People v. Carlucci* (1979) 23 Cal.3d 249, 256 [Evid. Code, § 775, a codification of case law, "'confers upon the trial judge the power, discretion and affirmative duty . . . [to] participate in the examination of witnesses whenever he [or she] believes that he [or she] may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his [or her] right of explanation, and in eliciting facts material to a just determination of the cause'"].)

The record demonstrates the court participated in the examination of witnesses to clarify confusing testimony and to advance the questioning. Elizabeth was a reluctant witness. She was neither forthcoming nor articulate, and the prosecutor struggled to establish basic propositions and to refresh her recollection with statements she had made to detectives. For example, an inordinate amount of time was spent trying to establish Elizabeth's familiarity with Garcia and Renteria and where they were when she first came home the evening Hunter was shot. Finally, the court intervened:

"The Court: . . . The point is that you—these were what, friends of your brothers; is that what you thought?

"The Witness: Yeah. They weren't in my house. They lived around that area, but they weren't in my house.

"The Court: So let's get to it. So you come home and your brother is there with two of his friends?

"The Witness: Yes.

"The Court: All right. Let's take up from there."

All of the court's questions to witnesses were in a similar vein. Renteria and Hunter were also reluctant witnesses. The court's questions simply facilitated the pace of the proceedings. If anything, the court's active engagement reflected poorly on the prosecutor's capabilities and skill; it did not suggest the court favored the prosecution or disbelieved the defense.

Finally, the jury was instructed with CALCRIM No. 3550, "Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." The jury is presumed to have followed the trial court's instructions, and there is no indication it did not. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

3. *The Record Should Be Corrected To Reflect the Prior Prison Term Allegation Was Not Proved*

Although it was specially alleged Garcia had served a separate prior prison term for a felony conviction in 2004, at the bifurcated trial on Garcia's prior convictions the

13

People introduced no evidence regarding that conviction; and the court made no finding and neither imposed nor stayed an additional enhancement pursuant to Penal Code section 667.5, subdivision (b). Garcia contends the absence of any evidence in support of the special allegation and the court's failure to address it should be considered an implied not true finding. He argues the record should be corrected to reflect that finding. (Cf. *People v. Gutierrez* (1993) 14 Cal.App.4th 1425, 1440 ["[w]hen no words are used and the trier of fact fails to make a finding the effect is the same as a finding of 'not true'"].) We agree and order the judgment entered on June 27, 2014 to be modified to reflect that the special allegation Garcia had served a prior separate prison term for a 2004 felony conviction was not proved.

### DISPOSITION

The judgment is modified to include a finding that the special allegation Garcia had served a prior separate prison term for a 2004 felony conviction was not proved. As modified, the judgment is affirmed.

PERLUSS, P. J.

We concur:

ZELON, J.

BLUMENFELD, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.