Filed 7/21/23  P. v. Ward CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B322508 |
| Plaintiff and Respondent, | (Tulare County Super. Ct. No. VCF353970) |
| v. | |
| PAUL BRIAN WARD, | |
| Defendant and Appellant. | |
| | |
| In re PAUL BRIAN WARD on Habeas Corpus. | B325350 |
| | (Tulare County Super. Ct. No. VCF353970) |

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.  Affirmed and remanded with directions.

ORIGINAL PROCEEDING; petition for a writ of habeas corpus, Juliet L. Boccone, Judge.  Petition denied.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant and for Petitioner in the Habeas Proceeding.

Rob Bonta, Attorney General, Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Louis M. Vasquez and Eric L. Christoffersen, Supervising Deputy Attorneys General, Amanda D. Cary, Jennifer Olesksa, Kari R. Mueller and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent and for Respondent in the Habeas Proceeding.

—————————————————————————

Paul Brian Ward appeals the judgment entered following a jury trial in which he was convicted of the attempted murder (Pen. Code,[1] §§ 664/187, subd. (a); count 1) and assault on Visalia Police Officer Frank Lopez with force likely to produce great bodily injury (§ 245, subd. (c); count 2), as well as multiple counts of resisting an executive officer, assault, and battery.[2]  The jury

---

[1] Undesignated statutory references are to the Penal Code.

[2] The other counts of conviction included:  three counts of resisting an executive officer (§ 69; count 3–Officer Frank Lopez, count 4–Officer Samantha Valenzuela-Adney, and count 5–Officer Tim Haener), attempted removal of a weapon (baton) from a peace officer (§§ 664/148, subd. (b), count 7–Officer Frank Lopez), assault with force likely to produce great bodily injury (§ 245, subd. (a)(4)), count 8–appellant's son), attempted criminal threats (§§ 664/422, a lesser included offense of criminal threats,

2

found not true the allegation that the attempted murder was willful, premeditated and deliberate. The jury also acquitted appellant of criminal threats as charged in count 9, convicting him instead of the lesser included offense of attempted criminal threats. The trial court sentenced appellant to 7 years to life plus a determinate term of 5 years 4 months in state prison.

While this appeal was pending, and upon consideration of the ineffective assistance of counsel arguments presented in appellant's briefs on appeal, we invited appellant to file a petition for a writ of habeas corpus to permit inquiry into matters outside the appellate record. On January 3, 2023, appellant filed a redacted petition for writ of habeas corpus.[3] An order to show cause (OSC) returnable to this court was issued on February 8, 2023. Respondent filed a redacted return to the OSC on April 11, 2023,[4] and a traverse in support of the writ petition was filed on May 18, 2023.

In his appeal, appellant contends his conviction for attempted murder was not supported by substantial evidence. Specifically, he maintains that the evidence was too speculative and insufficient to establish an intent to kill. Appellant further contends that the trial court prejudicially erred by allowing appellant to appear before the jury in jail clothes and restraints,

---

count 9), misdemeanor battery upon emergency personnel (§ 243, subd. (b), count 10), and two counts of misdemeanor battery (§ 242, counts 11 & 12).

[3] An unredacted petition was filed under seal on January 5, 2023.

[4] Respondent filed an unredacted return under seal on April 12, 2023.

and by failing sua sponte to instruct the jury with CALCRIM No. 3425 on the defense of unconsciousness.  Finally, appellant asserts the trial court abused its discretion by admitting testimony that he possessed a cache of guns, ammunition and knives, as well as "antigovernment" and "occult" literature. According to appellant, this evidence was not just irrelevant, but it also constituted inadmissible propensity evidence under Evidence Code section 1101, subdivision (b).  The evidence was highly prejudicial and opened the door for further testimony that appellant met the criteria for an "active shooter," which the People emphasized in argument to the jury.  Appellant argues that given the overall weakness of the prosecution case, the trial court's errors and improper admission of this highly prejudicial evidence resulted in a miscarriage of justice requiring reversal.

We reject appellant's arguments.  Having reviewed the whole record in the light most favorable to the judgment, we conclude substantial evidence supports appellant's conviction for attempted murder.  The trial court had no sua sponte duty to give an instruction on the defense of unconsciousness.  Appellant's remaining claims are forfeited for lack of objection, and appellant fails to demonstrate ineffective assistance of counsel.

However, we accept the parties' agreement that remand for resentencing is necessary to require the trial court to stay the sentence on either count 1 or count 2 in accordance with section 654 as amended by Assembly Bill No. 518.  On remand, the trial court may also revisit all of its prior sentencing decisions, including what term to impose under section 1170, subdivision (b), as amended by Senate Bill No. 567.

In the petition for a writ of habeas corpus, petitioner asserts he was deprived of his right to effective assistance of

counsel under the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution by the following acts and omissions of defense counsel: (1) failing to arrange for petitioner to wear civilian clothing during trial and allowing petitioner to appear before the jury without objection in jail clothing; (2) failing to object or otherwise seek to exclude testimony concerning petitioner's possession of a large number of weapons and "antigovernment" books; (3) failing first to investigate an involuntary intoxication and/or "mental health" defense by obtaining petitioner's medical records from his Welfare and Institutions Code section 5150 hospitalization, and then failing to use those records to present a "mental health" defense or to support his unconsciousness and involuntary intoxication defenses.

We reject these claims, discharge the order to show cause, and deny the petition for a writ of habeas corpus.

## FACTUAL BACKGROUND

### A. Prosecution

On July 30, 2017, appellant's long-time friend and martial arts instructor, Marcy Manuele, visited appellant at his home where he lived with his mother to take him to church. Appellant and Manuele had known each other since high school, and Manuele started training appellant in martial arts when appellant was in his twenties. By 2017, appellant had a brown belt in judo, a second degree black belt in Aikido, and training in weapon retention and weapon takeaways for swords, guns, and batons. Appellant had also trained in MMA (mixed martial arts) under another instructor.

When Manuele arrived at appellant's home on July 30, his eyes were bloodshot, he appeared groggy, and he was

nonresponsive.  He told Manuele he had not slept in three days.
Manuele left and returned a couple hours later to check on
appellant and take him to breakfast.  While appellant was taking
a shower, Manuele waited for him in the kitchen with Barbara
Bailey, appellant's mother.  Appellant had been in the shower for
over an hour when Manuele heard him screaming.  Appellant
had been having "some mental health issues for the past year"
marked by "[r]andom outbursts of screaming," and it was not
unusual for appellant to start yelling for no apparent reason.
Throughout the year Manuele had witnessed episodes of
appellant suddenly screaming and "talking . . . in tongues,"
chanting to God, and saying "he was . . . being possessed."

Appellant's son Terrill and Bailey went into appellant's
room to check on him.  They found appellant standing naked in
the shower facing the wall with his arms crossed, mumbling to
himself.  Terrill and Bailey tried to get appellant's attention by
shaking him, and Bailey tried to put a towel around him.  But
appellant "was totally out of it" and did not respond.  Suddenly,
appellant began shouting "like a deranged, crazy man" that
"anyone who doesn't bow down to the God will be killed."  He
began counting down, and then turned around and started
swinging at Terrill.  Terrill forced his father back into the
shower, and the two continued fighting.  Appellant raised his
arms and tried to strangle Terrill, but his hands were wet and
slippery, and Terrill managed to escape his grip several times.

When Manuele heard more yelling, she went to appellant's
room.  There she saw appellant naked in the shower, screaming
that "everybody has to die" while trying to strangle Terrill with
both hands.  Terrill broke free, and he and appellant started
"throwing punches and head butting" each other.  Then appellant

6

turned on Bailey and Manuele, shoving his mother onto the bed, and punching Manuele with a closed fist once in the face and again on the side of her head.

The fighting moved outside to the backyard, with appellant "wildly trying to attack" Terrill, Manuele, and Bailey. Manuele called the police.

Visalia Police Officer Valenzuela-Adney was first to arrive on the scene. Appellant was naked and being held facedown by his son and his mother in the backyard. Appellant was yelling that "he was God." His arms were out to the side, and although he did not comply with Officer Valenzuela-Adney's command to put his hands behind his back, he offered no resistance when the officer grabbed his hands and put him in handcuffs. Once handcuffed, appellant became calm and almost seemed to fall asleep.

After speaking with the family, Officer Valenzuela-Adney felt appellant presented a danger to others due to his mental state and decided to place appellant on a "mental health hold" pursuant to Welfare and Institutions Code section 5150.[5] She requested an ambulance to transport him to the hospital.

Officers Frank Lopez and Tim Haener and other Visalia police officers arrived around the same time as the emergency medical personnel and ambulance. The officers tried to move appellant to a gurney, but appellant made his body go limp. At six feet, two inches tall and between 250 and 280 pounds, he was

---

[5] When a person presents a danger to others as a result of a mental health disorder, Welfare and Institutions Code section 5150 authorizes a peace officer to take the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention.

7

bigger than the officers, and they were unable to move him without his cooperation.

A paramedic asked that the handcuffs be removed to allow the medical personnel to conduct an assessment and to facilitate moving appellant to the gurney. But the moment Officer Valenzuela-Adney removed one of the handcuffs, appellant "immediately sprung up" and delivered a "very hard" MMA-style kick to the groin area of one of the ambulance personnel. He then began attacking the officers. As the officers tried to subdue appellant, he was swinging the arm with the handcuff still attached to the wrist. Fearing that appellant might use the open handcuff as a hook or brass knuckles, Officer Haener began to use his Taser. He tased appellant multiple times, to little effect.

As soon as Officer Haener stopped tasing him, appellant charged Officer Lopez, who had drawn his baton. Officer Lopez struck appellant in the legs with the baton. As Officer Lopez moved to strike again, appellant grabbed the baton in the middle, and Officer Lopez took hold of the other end. As the men struggled over the baton, appellant punched Officer Lopez in the face at least twice and kicked Officer Lopez's leg. Appellant then wheeled around the officer, wrapping his right arm around Officer Lopez's neck from behind and applying pressure to his throat as he put the officer in a carotid restraint, or "chokehold."

Manuele had trained appellant in chokeholds, which she explained can cause the person to whom one is applied to pass out by cutting off the blood supply to the brain. According to Officer Haener, a chokehold is in the category of deadly force because of the risk of breaking bones in the neck, which may be fatal.

While appellant had his right arm around Officer Lopez's neck, his left hand moved within five inches of the officer's gun, and a female voice shouted something to the effect of " '[w]atch your gun' " or " '[h]e's going for your gun.' " Believing lethal force might be necessary, Officer Haener drew his firearm, aiming for appellant's head. As Officer Haener tried to get a clear shot, Officer Valenzuela-Adney struck appellant on the back of his neck with her baton. The blow seemed to stun appellant momentarily and he released Officer Lopez. It then took at least six officers to finally restrain appellant as he continued to struggle.

That night, appellant's son told officers he thought his father " '[h]ad intent to kill,' " and that "[w]hen it comes to other people, especially not in the family, [he was] positive that [appellant] would have tried to kill them" in the state he was in.

A search of appellant's room turned up a cache of firearms, large capacity magazines, over 6,000 rounds of ammunition, and more than "30 bladed-type instruments," like knives, swords, and machetes. Police also found marijuana and numerous "antigovernment" books and "religious-occult-type literature." Officer Haener testified that he did not read or look at any of the books carefully, but assumed their content based on the titles.

**B. Defense**

Bailey testified that in the weeks leading up to the incident in this case, her son had been "very worried and wearing down" because he knew he was going to lose his job as a result of seizures he had been having. Appellant had not slept at all in the three days prior to the incident, and Bailey was concerned about him.

9

Appellant testified. After Officer Lopez took a two-handed baseball-bat-style swing at his head with the baton, appellant grabbed the baton and swung around to position himself behind Officer Lopez. Seeing Officer Haener pointing his gun at him, appellant threw his forearm across Officer Lopez's neck to hold him as a shield against "any incoming attack." Appellant denied ever placing Officer Lopez in a chokehold, explaining that there can be no chokehold with only one arm because the choke must be set with the other arm. Appellant also denied any intent or attempt to kill Officer Lopez, and he never even thought to take the officer's gun, which he could have done very easily and quickly. Rather, appellant asserted that everything he did was "instinctual"—he was "in fear [for his] life, because [he saw] a gun," and was just "trying to stay alive." If he had not acted as he did, Officer Haener would have shot him in the head, and "[he] would be dead right now."

Appellant admitted using "[a] little marijuana" the day before the incident. He explained that marijuana usually makes him feel calm, and the CBD in marijuana had "aid[ed] in preventing seizures until this incident." Appellant testified that he remembered only parts of the events that day. He remembered fighting with Terrill, but "did not recognize him as [his] son at the time," nor did he realize any of the people he was fighting were police officers or medical personnel. Throughout the incident he "was in and out of consciousness" and was "trying to get a message out" but could not recall what the message was.

Finally, appellant testified that he has books about the Second Amendment and the unconstitutionality of the current banking system of the United States, but no books about resistance to the government.

10

**DISCUSSION**

## I. The Appeal

### A. Substantial Evidence Supports Appellant's Conviction for Attempted Murder

Appellant contends the evidence presented at trial was insufficient to support his conviction for the attempted murder of Officer Lopez. Specifically, appellant argues that there was no competent evidence that appellant intended to kill Officer Lopez. Moreover, appellant maintains that because his application of pressure to Officer Lopez's neck did not amount to an actual chokehold, and because he never in fact reached for the officer's gun, appellant's conduct did not establish the required element for attempted murder of "a direct but ineffectual act toward accomplishing the intended killing." (*People v. Juarez* (2016) 62 Cal.4th 1164, 1170.)

#### 1. *Applicable legal principles*

As our Supreme Court has repeatedly explained, when considering a challenge to the sufficiency of the evidence in support of a conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citations.] We consider ' "whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] '[A] reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780.) " ' " ' "If the circumstances reasonably justify the trier of fact's

11

findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' [Citation.] 'A reviewing court neither reweighs [the] evidence nor reevaluates a witness's credibility.' [Citation.] Reversal is not warranted 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]" ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 377–378.) Finally, while " '[e]vidence of a defendant's state of mind is almost inevitably circumstantial, . . . circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)

2. *Substantial evidence supports findings that appellant took a direct but ineffectual step toward killing Officer Lopez and intended to kill Officer Lopez*

" 'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Sanchez* (2016) 63 Cal.4th 411, 457 (*Sanchez*); *People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 7; § 21a.) Substantial evidence supports both of these elements in the instant case.

There was substantial evidence to support the conclusion that appellant's act of positioning himself behind Officer Lopez, wrapping his arm around the officer's neck, and applying pressure to his throat to place him in a chokehold constituted a direct but ineffectual act toward killing Officer Lopez. Appellant was about five inches taller and outweighed Officer Lopez by 70 to 100 pounds. He also had an extensive background in martial arts as well as training in executing chokeholds, which can be used to incapacitate a person by cutting off blood flow to the

12

brain and causing unconsciousness. Officer Haener explained that application of a chokehold can kill a person by breaking bones in the neck. If the person applying the chokehold is significantly larger than the subject and strong enough, a chokehold can be successfully executed with only one arm. According to Officer Haener, because chokeholds constitute lethal force, their use is prohibited by the Visalia Police Department except under extreme circumstances.

On the strength of this evidence, a rational jury could reasonably conclude that appellant's act of placing Officer Lopez in a chokehold—itself a potentially lethal maneuver—satisfied the element of taking a direct step toward accomplishing the officer's murder. Indeed, that result was thwarted only by Officer Valenzuela-Adney's act of striking appellant on the back of his neck with her baton, stunning appellant and forcing him to release Officer Lopez.

Appellant argues that the evidence was insufficient to establish a direct but ineffective step toward killing the officer because, among other reasons, "Officer Lopez never felt he was going to lose consciousness," he could not remember if he had trouble breathing, and appellant "never used his other hand to set the choke hold." But Officer Lopez's reaction to the chokehold is irrelevant to establishing the elements of the crime. Moreover, there was abundant evidence that a chokehold could be performed with just one arm, and the fact that appellant *initiated* a chokehold on Officer Lopez was never in question: Manuele, appellant's own martial arts instructor, described the maneuver as a chokehold, as did Officers Valenzuela-Adney, Lopez, and Haener, among others.

Substantial evidence also supported the jury's finding that appellant intended to kill Officer Lopez when he placed the officer in a chokehold. Appellant himself announced his intent to kill when he yelled "everybody has to die" and "anyone who doesn't bow down to the God will be killed." Appellant's own son told the police that, based on the "state" his father was in that night, he was "positive" his father had the intent to kill, especially when it came to other people outside the family. (See *People v. Stone* (2009) 46 Cal.4th 131, 141 [a defendant who acts with the intent to kill a random person is as guilty of attempted murder as the defendant who intends to kill a specific person].)

In any event, "[b]ecause direct evidence of a defendant's intent rarely exists, intent may be inferred from the circumstances of the crime and the defendant's acts." (*Sanchez*, *supra*, 63 Cal.4th at p. 457; *People v. Smith* (2005) 37 Cal.4th 733, 741 (*Smith*).) Here, appellant's extensive martial arts training together with the inherently lethal nature of the chokehold he initiated against Officer Lopez was sufficient evidence from which the jury could reasonably infer appellant's intent to kill. (See *Smith*, at pp. 741–742 [act of firing gun toward a victim at close, but not point blank, range is sufficient to support an inference of intent to kill where the shot could have inflicted a mortal wound had it been on target]; *People v. Arias* (1996) 13 Cal.4th 92, 162 [jury could properly infer an intent to kill from defendant's purposeful use of a lethal weapon with lethal force, "even if the act was done without advance consideration and only to eliminate a momentary obstacle or annoyance"]; see also *People v. Hernandez* (1988) 47 Cal.3d 315, 349 [killing by strangulation "is indicative of at least a deliberate intent to kill"].)

14

"Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 946; *Smith, supra,* 37 Cal.4th at p. 739.) Although reasonable minds may differ on the resolution of that question, our duty is to determine whether " ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Holmes, McClain and Newborn, supra,* 12 Cal.5th at p. 780.)

Applying this standard to the jury's verdict compels the conclusion that substantial evidence supported appellant's attempted murder conviction based on his act of placing Officer Lopez into a chokehold.

**B. By Failing to Object Below, Appellant Forfeited His Claim that the Trial Court Erred and Violated His Constitutional Rights by Allowing Him to Appear Before the Jury in Jail Clothes and Restraints**

1. *Proceedings below*

Appellant appeared in jail attire for jury selection and testimony on the first day of trial, and was in leg restraints for the entire trial. After Manuele had identified appellant and described him as wearing a black and white striped "prison outfit," the following discussion took place between the court and counsel outside the presence of the jury:

"THE COURT: . . . I know we discussed this prior to the record, but on the record your client is not dressed out in civilian clothes. He's wearing jail clothes. That was your choice. You decided to do that, [defense counsel]?

"[DEFENSE COUNSEL]: Yes.

"THE COURT:  Okay.  Because what I was told was he was going to do that or have other clothes.  He didn't have other clothes—

"[DEFENSE COUNSEL]:  It wasn't my choice, per se.  They weren't provided.

"THE COURT:  But you agreed to have him come out.

"[DEFENSE COUNSEL]:  I did agree to that, yes."

"THE DEFENDANT:  They didn't let me out of my cell to be able to call, like, my mom or anybody.  You know what I mean?"

"THE COURT:  Yes.  [Defense counsel], you could have called [his] mom.

"[DEFENSE COUNSEL]:  I could have.  There are some other issues there.  His mother has been ill."

After the first day of trial, appellant appeared in the courtroom wearing a gray shirt or sweater, and witnesses no longer identified him by describing his attire as jail clothing.

As for the leg restraints, defense counsel never made an objection or otherwise raised an issue about them to the trial court.  Indeed, counsel declined an admonition to the jury to disregard the restraints, saying:  "It's not an issue.  We don't need it. [¶] . . . [¶] He's in a jail outfit.  I think they know what's going on, or he's an oddly dressed gentleman."  Initially, the trial court also believed an instruction was unnecessary because the jury had not seen the restraints.  However, when appellant took the stand to testify, the restraints were visible to the jury, and the trial court instructed the jury sua sponte to disregard the fact that defendant was in physical restraints during trial, not to speculate about the reason, and not to consider it for any purpose.  (CALCRIM No. 204.)

16

2. *Applicable legal principles*

"The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment," and is a core principle of our system of criminal justice. (*Estelle v. Williams* (1976) 425 U.S. 501, 503 (*Estelle*) [96 S.Ct. 1691, 48 L.Ed.2d 126].) In line with that principle, " 'the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes.' " (*People v. Garton* (2018) 4 Cal.5th 485, 500 (*Garton*), quoting *Estelle*, at p. 512.) Foremost among the "substantial reasons for the rule that a criminal defendant is entitled to be tried in ordinary clothing . . . is the rationale that compelling a defendant to go to trial in jail clothing could impair the fundamental presumption of our system of criminal justice that the defendant is innocent until proved guilty beyond a reasonable doubt." (*People v. Taylor* (1982) 31 Cal.3d 488, 494 (*Taylor*); *Garton*, at p. 500.) Indeed, "the defendant's jail clothing is a constant reminder to the jury that the defendant is in custody, and tends to undercut the presumption of innocence by creating an unacceptable risk that the jury will impermissibly consider this factor." (*Taylor*, at p. 494; *Estelle*, *supra*, 425 U.S. at pp. 504–505; *Garton*, at p. 500.)

Similar concerns arise when a defendant is required to appear before the jury in physical restraints, which can "carry an inordinate risk of infringing upon a criminal defendant's right to a fair trial." (*People v. Stevens* (2009) 47 Cal.4th 625, 632 (*Stevens*); *Deck v. Missouri* (2005) 544 U.S. 622, 630 [125 S.Ct. 2007, 161 L.Ed.2d 953] ["Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process. [Citation.] It suggests to the jury that the

17

justice system itself sees a 'need to separate a defendant from the community at large' "].)

"A trial court has broad power to maintain courtroom security and orderly proceedings, and its decisions on these matters are reviewed for abuse of discretion." (*People v. Simon* (2016) 1 Cal.5th 98, 115.) " 'However, the court's discretion to impose physical restraints is constrained by constitutional principles. Under California law, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." ' " (*People v. Poore* (2022) 13 Cal.5th 266, 285 (*Poore*), quoting *People v. Lomax* (2010) 49 Cal.4th 530, 558–559; *Simon*, at p. 115.) The federal Constitution also " 'forbids the use of visible shackles . . . unless that use is "justified by an essential state interest"—such as the interest in courtroom security—specific to the defendant on trial.' " (*Poore*, at p. 285, quoting *Lomax*, at p. 559; *People v. Covarrubias* (2016) 1 Cal.5th 838, 870.) Our Supreme Court has declared that "[t]he use of physical restraints in the absence of a record showing of violence, a threat of violence, or other nonconforming conduct is an abuse of discretion." (*Simon*, at p. 115; *Covarrubias*, at p. 871.)

"Although no formal hearing on the matter is required [citation], 'when the use of restraints is based on conduct of the defendant that occurred outside the presence of the trial court, sufficient evidence of such conduct must be presented on the record so that the court may make its own determination of the nature and seriousness of the conduct and whether there is a manifest need for such restraints. [Citation.] The court may not, we have emphasized, merely rely on the judgment of law

18

enforcement or court security officers or the unsubstantiated comments of others.' " (*Poore, supra,* 13 Cal.5th at p. 285, quoting *Simon, supra*, 1 Cal.5th at p. 115; *Stevens, supra,* 47 Cal.4th at pp. 641–642 ["it is the function of the trial court, not the prosecutor or law enforcement personnel, to determine whether manifest need supports the use of physical restraints in the courtroom"].)

Both rights—to appear before the jury unrestrained and in civilian rather than jail attire—must be asserted in the trial court to preserve the issue for appeal. (*Estelle, supra,* 425 U.S. 512–513 [jail clothes]; *Taylor, supra,* 31 Cal.3d at pp. 495–496 [jail clothes]; *In re Avena* (1996) 12 Cal.4th 694, 731 [jail clothes]; *People v. Ward* (2005) 36 Cal.4th 186, 206 (*Ward*) [restraints]; *People v. Majors* (1998) 18 Cal.4th 385, 406 [restraints]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 583 [restraints].)  With regard to jail attire, the United States Supreme Court has held that "the failure to make an objection to the court as to being tried in [prison] clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." (*Estelle, supra,* 425 U.S. 512–513.)  Likewise, "[i]t is settled that the use of physical restraints in the trial court cannot be challenged for the first time on appeal." (*Tuilaepa*, at p. 583; *Ward*, at p. 206 [same]; *Majors*, at p. 406 [same]; *People v. Stankewitz* (1990) 51 Cal.3d 72, 95 [defendant "must object to the use of physical restraints or the claim will be deemed waived on appeal"].)

3. *Analysis*

Appellant made no objection nor did he otherwise raise any issue in the trial court regarding his appearance before the jury in jail attire or leg restraints.  He therefore forfeited these claims

19

on appeal.  (*Taylor, supra,* 31 Cal.3d at p. 495 ["Although the right to be tried in civilian clothing is a constitutional right valuable to a fair trial, the right may be waived by a failure to timely object or otherwise bring the matter to the court's attention"]; *Ward, supra*, 36 Cal.4th at p. 206 [having failed to make an objection at trial on constitutional or any other grounds regarding his physical restraints, defendant forfeited the claim on appeal].)

Appellant seeks to avoid forfeiture of the claim by asserting that his counsel was ineffective for failing to object, thereby violating his right to counsel under the Sixth Amendment to the federal Constitution.  Under California or federal constitutional principles, the standard for judging an ineffective assistance of counsel claim is " 'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " (*In re Valdez* (2010) 49 Cal.4th 715, 729 (*Valdez*), quoting *Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*) [104 S.Ct. 2052, 80 L.Ed.2d 674].)

To establish ineffectiveness, a defendant must show both that "counsel's performance was deficient"—that is, the attorney's "representation fell below an objective standard of reasonableness" "under prevailing professional norms," and that "the deficient performance prejudiced the defense." (*Strickland, supra*, 466 U.S. at pp. 687, 688; *Valdez, supra*, 49 Cal.4th at p. 729; *Williams v. Taylor* (2000) 529 U.S. 362, 390–391 [120 S.Ct. 1495, 146 L.Ed.2d 389].)  "This second part of the *Strickland* test 'is not solely one of outcome determination. Instead, the question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding

fundamentally unfair." ' " (*In re Hardy* (2007) 41 Cal.4th 977, 1019; *Valdez*, at p. 729.)

In addressing an ineffective assistance of counsel claim, a reviewing " 'court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 982, quoting *Strickland, supra,* 466 U.S. at p. 697.)

So it is in the case at bar. Appellant's claim of ineffective assistance fails because he has not demonstrated prejudice warranting reversal. As a preliminary matter, given that appellant was charged with the attempted murder of a police officer, it would have come as no surprise to the jury that appellant was in custody. Moreover, as set forth above, substantial evidence supported the jury's findings that with the specific intent to kill, appellant took a direct but ineffectual step toward the killing Officer Lopez. (*Sanchez, supra,* 63 Cal.4th at p. 457.) But most significantly, the jury found not true the allegation that the attempted murder was premeditated and deliberate, and it acquitted appellant on the charge of criminal threats. These verdicts clearly demonstrate that appellant's appearance at trial in jail clothes and leg restraints did not prejudice the jury against him, much less result in a conviction based on a view of appellant "as a dangerous criminal, who belonged in jail."

21

## C. The Trial Court Had No Sua Sponte Duty to Instruct the Jury with CALCRIM No. 3425 on the Defense of Unconsciousness

Appellant contends that the trial court violated his constitutional rights and committed reversible error by failing sua sponte to instruct the jury with CALCRIM No. 3425[6] on the defense of unconsciousness.  We disagree.

1. *Applicable legal principles*

" 'Unconsciousness, if not induced by voluntary intoxication, is a complete defense to a criminal charge.' " (*People v. Parker* (2017) 2 Cal.5th 1184, 1223; *People v. Halvorsen* (2007) 42 Cal.4th 379, 417 (*Halvorsen*); see also § 26, class Four.)  "To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' " (*Halvorsen*, at p. 417.)  However, it is presumed "that a person who appears to act in an apparent state of consciousness is conscious.  [Citation.]  Therefore, the burden is on a criminal defendant to produce evidence rebutting this presumption of consciousness." (*People v. James* (2015) 238 Cal.App.4th 794, 804 (*James*).)

---

[6] CALCRIM No. 3425 provides that "[t]he defendant is not guilty of [a crime] if [he or she] acted while unconscious.  Someone is unconscious when he or she is not conscious of his or her actions."  A person "may be unconscious even though able to move," and unconsciousness may be caused by, among other things, an epileptic seizure or involuntary intoxication.  However, "[t]he defense of unconsciousness may not be based on voluntary intoxication."

"A trial court must instruct on unconsciousness on its own motion if it appears the defendant is relying on the defense, or if there is substantial evidence supporting the defense and the defense is not inconsistent with the defendant's theory of the case." (*People v. Rogers* (2006) 39 Cal.4th 826, 887 (*Rogers*).) In assessing the sufficiency of the evidence to warrant instruction on a defense, the trial court does not judge the credibility of the defense evidence, but determines "only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt'" as to the defendant's guilt. (*People v. Salas* (2006) 37 Cal.4th 967, 982.)

2. *Analysis*

Appellant's actions during the encounter with police and his own testimony demonstrated that appellant was fully aware of his surroundings, he reacted quickly and purposefully to changing circumstances, and he knew what he was doing throughout the incident. Moreover, the defense presented no medical evidence or expert testimony to show that appellant might have been acting in a state of unconsciousness. Accordingly, because substantial evidence did not support a finding of unconsciousness and appellant plainly did not rely on the defense, the trial court had no sua sponte duty to instruct the jury with CALCRIM No. 3425 in this case.

Appellant had extensive training in martial arts and MMA fighting, and used that training when he attacked the medical and law enforcement personnel who responded to the 911 call that day. Although appellant testified that throughout the attack he was "out of it," "in and out of consciousness," and had very little recollection of events, he directly contradicted those statements when he testified about his memories of the precise

23

manner in which he put his arm around Officer Lopez's neck, exactly what he intended to accomplish with that maneuver, and other specific details about the sequence of events. Contrary to appellate counsel's assertion in oral argument, appellant's testimony about his actions during the incident was not simply what he *would* have done in response to hypothetical questions posed by the prosecutor. Rather, throughout his testimony, appellant described his precise movements in response to the situation and explained in some detail his rationale behind each of his actions.

Further, appellant's actions told a very different story than the one he sought to portray to the jury. As he lay handcuffed on the ground, appellant first resisted the paramedics' and officers' efforts to move him to a gurney for treatment by going limp and becoming dead weight. He remained still and limp until the moment one of the handcuffs was released, at which point he suddenly jumped up and delivered a hard MMA-style kick to the EMT's groin. As officers attempted to subdue appellant, he continued kicking and fighting anyone who got close to him. Appellant stopped fighting when Officer Haener used his Taser to subdue him, but the moment the tasing cycle ended, appellant charged Officer Lopez. After grabbing Officer Lopez's baton, appellant swung around and placed his forearm on the officer's neck, holding him as a human shield.

In light of the overwhelming evidence showing that appellant was fully aware of his actions throughout his encounter with the police, his claimed memory lapses and assertions of being "out of it" do not constitute substantial evidence supporting an instruction on the defense of unconsciousness. (See *Halvorsen, supra,* 42 Cal.4th at p. 418 ["The complicated and

24

purposive nature of [defendant's] conduct" suggested defendant "did not lack awareness of his actions during the course of the offenses"].) Indeed, a "defendant's own testimony that he could not remember portions of the events, standing alone, [is] insufficient to warrant an unconsciousness instruction." (*Rogers, supra,* 39 Cal.4th at p. 888; see also *People v. Froom* (1980) 108 Cal.App.3d 820, 829–830 [evidence of defendant's forgetfulness and statement to psychiatrist that he "awakened" after the crime was committed was insufficient for unconsciousness instruction]; *People v. Heffington* (1973) 32 Cal.App.3d 1, 10 [there is no "ineluctable rule of law" that holds "a defendant's inability to remember or his 'hazy' recollection supplies an evidentiary foundation for a jury instruction on unconsciousness"]; *People v. Coston* (1947) 82 Cal.App.2d 23, 40 ["a defendant's mere statement of forgetfulness, unsupported by any other evidence, is at most very little evidence of unconsciousness at the time of performing a particular act" and does not justify a finding of unconsciousness].)

Appellant's reliance on *James, supra,* 238 Cal.App.4th 794, to argue that his "erratic, unusual behavior" supported an unconsciousness instruction is misplaced. In *James*, the court reversed, finding substantial evidence that defendant was unconscious during the commission of the offenses supported instruction on the defense of unconsciousness, which the trial court had refused. (*James,* at p. 797.) The appellate court's substantial evidence finding was based on witness descriptions of defendant's bizarre actions as well as medical expert reports and testimony that defendant suffered from a seizure disorder and posttraumatic stress, which had caused a "severe or bizarre psychotic episode" during which he " 'did not have awareness of

25

what took place' " and " 'had no knowledge of his behavior' " when he committed mayhem and assault with great bodily injury. (*James,* at pp. 797–798, 800–801; see also *People v. Gana* (2015) 236 Cal.App.4th 598, 609–610 (*Gana*) [substantial evidence supported unconsciousness instruction where medical expert testified defendant was likely experiencing delirium brought on by psychosis, symptoms of depression, and cancer medications].)

In stark contrast to the *James* and *Gana* cases, no medical expert testimony was presented here to suggest that appellant was unconscious when he committed the offenses. Moreover, while witnesses stated appellant had a history of "seizures" and described appellant's unusual behavior that day and on previous occasions (suddenly announcing he was God, appearing to speak in tongues, etc.), there was no evidence appellant was unaware of his surroundings or what he was doing when he resisted the police and paramedics and launched his attacks. (Cf. *Gana, supra,* 236 Cal.App.4th at p. 609 [defendant remained silent when asked a series of standard questions, her eyes were wide open in "a thousand mile stare," and her face lacked emotion when she shot the victim].)

Finally, the trial court had no sua sponte duty to give CALCRIM No. 3425 because appellant did not actually rely on an unconsciousness defense. Rather, the entire defense was built on the premise that appellant's mental state was such that he did not form an intent to kill Officer Lopez. The defense did not articulate any theory of unconsciousness or present any medical evidence or expert testimony to support an unconsciousness defense. (*Gana, supra,* 236 Cal.App.4th at p. 609 [" 'medical testimony . . . as to why [the defendant] was unconscious' can support an instruction on this defense"].)

Moreover, even defense counsel observed that any conclusion about appellant's mental state that day would be speculative: "What do you all make of [defendant's] mental state that day? As I said, we don't have a doctor here. We don't have a professional. We're all kind of guessing." Indeed, rather than argue unconsciousness as a defense, counsel urged the jury to consider what evidence there was about appellant's mental state and find simply that he did not intend to kill. "[Defendant] very plainly told you he had no intention to kill Officer Lopez by choking him. . . . [¶] That's basically our case. We're asking you not to find guilt on the criminal threats against his son, because [Terrill] was not fearful for his safety, and the other charge, Count 1, attempted murder of a police officer. He did not have the intent to do it. That's our case. We're not refuting the other stuff at all. You don't get to punch police officers. No."

## D. Appellant Forfeited Any Argument that the Trial Court Abused Its Discretion in Admitting Testimony About the Weapons and Books Found in His Home

Appellant contends that the trial court abused its discretion "by admitting testimony that [he] had a cache of guns and knives in his house and that he read antigovernment books." Appellant argues that admission of this evidence allowed the People to "portray appellant to the jury as a dangerous active shooter, who always had killing on his mind." Appellant maintains that because the evidence was irrelevant, more prejudicial than probative, and constituted highly inflammatory propensity evidence, its admission was highly prejudicial and violated his federal Constitutional rights, requiring reversal. We conclude that in the absence of a specific objection, appellant

27

forfeited the claim and the trial court did not abuse its discretion in admitting the evidence.

1. *Proceedings below*

On redirect examination, the prosecutor asked appellant's son Terrill if appellant read any antigovernment books. The trial court overruled defense counsel's objections on grounds of speculation and lack of personal knowledge. Terrill said he only knew appellant read the Christian Bible and had some books about the constitution. The prosecutor then asked Terrill if appellant had any guns. Terrill answered yes, and the prosecutor asked how many. After the trial court overruled defense counsel's relevance objection, Terrill testified that appellant had perhaps more than five guns and a lot of knives, which he collected.

Officer Haener testified that during a search of appellant's house he discovered numerous firearms, more than 6,000 rounds of ammunition, and large capacity-style magazines for firearms. He also testified to seeing "numerous books, such as antigovernment and certain religious-occult-type literature." When the prosecutor asked the officer what he meant by "antigovernment books," defense counsel interposed a relevance objection. The prosecutor responded that "[i]t goes to motive," and the trial court overruled the objection. Officer Haener answered: ". . . some were books for amendments to the constitution. Some were books that were more leaning towards antigovernment, like, you know, not complying with the government. I didn't actually read any of the books. It was just the covers and laying about." The officer added that he just saw the titles. "I didn't actually physically go into those books and read those books, because it was such a chaotic scene. I was

actually more worried about the firearms, due to the fact that what had just occurred, about doing something with those firearms. And family members had stated that they wanted those firearms removed from the house." When asked if he had found any swords, knives, or machetes, Officer Haener replied, "I believe there was in excess of 30 bladed-type instruments."

During the defense cross-examination of Officer Haener, the following exchange occurred:

"[DEFENSE COUNSEL:] I just want to understand about the antigovernment books as related to motive for the incident. It's your testimony that once you looked at [defendant's] home and you found the antigovernment books, that you felt that that provided some motive for his actions that day?

"[OFFICER HAENER:] I believe that it was—it led to the totality of the circumstances. Part of my training and experience, too, has been training for active shooter situations. And in active shooter training they talk about all the things I saw when I walked into that room.

"[DEFENSE COUNSEL:] Certainly. So him yelling, 'I am God,' is related somehow to the antigovernment motive; correct?

"[OFFICER HAENER:] Again, it's the totality. It's the aggression. It's the—it's the totality of everything that I saw, everything I experienced that day."

In argument to the jury, the prosecutor cited the officer's testimony to argue premeditation and intent to kill:

"[PROSECUTOR]: . . . So he's reading antigovernment books. He's got what could only be described as a cache of weapons, which is fine. People are allowed to have weapons, a second amendment right. It shows that killing's on his mind. [¶] When they searched the defendant's room and his house, [Officer

Haener] saw, based on his training and experience in this particular issue, matched up all the signs of an active shooter; killing is on his mind. It's always an option. It's always on the table. All he needs is the opportunity and a target. It's always there."

2. *Applicable legal principles*

In general, "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351; *People v. Turner* (2020) 10 Cal.5th 786, 805.) Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; *People v. Mataele* (2022) 13 Cal.5th 372, 413 (*Mataele*).)

An appellate court reviews "the trial court's rulings on relevance and the admission of evidence under Evidence Code sections 352 and 1101 for abuse of discretion." (*People v. Battle* (2021) 11 Cal.5th 749, 799.) The "trial court's decision to admit or exclude evidence ' " 'will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice.' " ' [Citations.] 'This standard of review affords considerable deference to the trial court provided that the court acted in accordance with the governing rules of law. We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise.' " (*Mataele, supra*, 13 Cal.5th at p. 414.)

Pursuant to Evidence Code section 353, subdivision (a), "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an

30

objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." Accordingly, "a defendant forfeits an argument on appeal where he fails to object at all to the evidence in the trial court or when he objects on substantively distinct grounds." (*People v. Flinner* (2020) 10 Cal.5th 686, 726; *People v. Seijas* (2005) 36 Cal.4th 291, 302 ["In accordance with [Evidence Code section 353], we have consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable"].)

     3. *Appellant forfeited any claim of error by failing to make an appropriate objection*

Appellant never sought exclusion of the evidence regarding the cache of guns, magazines, ammunition, and bladed weapons in his possession or the "antigovernment" books found in his home under Evidence Code sections 352 or 1101. Although defense counsel objected on relevance grounds to the question to Terrill about the *number* of firearms appellant had in his possession, there was no objection at all to the general questions about whether appellant possessed any guns, swords, knives, or machetes. Similarly, as appellant acknowledges, there was no objection on any grounds whatsoever to Officer Haener's testimony about the firearms, 6,000 rounds of ammunition, and large capacity magazines that police found in appellant's room. Defense counsel also did not object when the prosecutor asked Officer Haener whether he found any swords, knives, or machetes in the room, or when Officer Haener responded that he found "in excess of 30 bladed-type instruments." As for the antigovernment books, appellant asserted one relevance

31

objection—when the prosecutor asked Officer Haener what he meant by "antigovernment books."

Appellant also appears to argue that Officer Haener's testimony regarding his impression that appellant had the characteristics of an "active shooter" based on his possession of the guns and antigovernment books was improperly admitted. But it was *defense counsel* who elicited that testimony, and after it came out, appellant neither objected to the officer's testimony nor requested that it be stricken.

The trial court did not abuse its discretion in overruling appellant's two relevance objections to the questions about the number of guns in appellant's possession and what the officer meant when he described the books in appellant's room as "antigovernment." The evidence that appellant possessed numerous weapons was relevant because it corroborated testimony that he was familiar with the use of these weapons and weapon takeaways, which in turn tended to prove a contested issue—that appellant's actions in grabbing Officer Lopez's baton and reaching for his firearm were calculated acts. Further, evidence that appellant had "antigovernment" books in his room was relevant to explain appellant's response to police authority and show intent and a motive for his unrelenting resistance to the police and medical personnel who were there at the family's request.

"A proper objection must ' " 'fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.' " ' " (*People v. Jackson* (2016) 1 Cal.5th 269, 328.) Other

than his two relevance objections, appellant neither objected nor asked the trial court to exercise its discretion under Evidence Code section 352 to exclude (or strike) any of this testimony on the ground that its probative value was outweighed by the substantial danger of undue prejudice. Finally, the record is devoid of any mention of Evidence Code section 1101, much less a defense request to exclude evidence on that basis.

Having failed to object to the admission of the testimony about appellant's weapons and "antigovernment books" on the grounds asserted on appeal, appellant has forfeited this claim of error.

4. *Appellant cannot establish ineffective assistance of counsel*

Appellant contends that his challenge to the admission of testimony about the weapons and books in his possession has not been forfeited because defense counsel was ineffective for failing to properly object. He argues that where, as here, there could be no satisfactory explanation for the failure to object or offer a sufficient basis to exclude the evidence, trial counsel's failure to preserve an evidentiary error for appeal constitutes ineffective assistance of counsel.

As our Supreme Court has observed, however, a defendant "cannot automatically obtain merit review of a noncognizable issue by talismanically asserting ineffective assistance of counsel. [¶] Whether to object at trial is among 'the minute to minute and second to second strategic and tactical decisions which must be made by the trial lawyer during the heat of battle.' [Citation.] Although trial counsel may have the duty to protect the record when their client's trial interests are truly at stake, they have no duty to object simply to generate appellate issues. Sometimes,

33

the best action an attorney can take regarding an available objection is not to make it." (*People v. Riel* (2000) 22 Cal.4th 1153, 1202.)

Moreover, assuming deficient performance by counsel, to establish prejudice under the *Strickland* standard, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 104 [131 S.Ct. 770, 178 L.Ed.2d 624] (*Harrington*).) Rather, the defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693–694.) And "[t]he likelihood of a different result must be substantial, not just conceivable." (*Harrington*, at p. 112; *People v. Jacobs* (2013) 220 Cal.App.4th 67, 75.)

Here, appellant fails to demonstrate prejudice in support of his ineffective assistance claim regarding the admission of testimony about his possession of guns, knives, and "antigovernment" books. As discussed, the evidence was relevant to the contested issues of motive and intent. Further, given the jury's not true finding on the premeditation allegation and its acquittal on the criminal threats charge, appellant cannot show a reasonable likelihood of a more favorable result had defense counsel sought to exclude the testimony under Evidence Code sections 352 or 1101.

## E. Remand for Resentencing Is Required

The parties agree that the trial court erred in sentencing appellant on both counts 1 and 2 in violation of section 654, because both crimes were committed "by a single act, as part of [a] continuous course of conduct, on the same occasion, against the same victim," that is, against Officer Lopez. (*People v. Hester*

34

(2000) 22 Cal.4th 290, 294 ["Section 654 precludes multiple punishments for a single act or indivisible course of conduct"].)

At the time of appellant's sentencing in 2019, section 654 provided that an act or omission that was punishable in different ways under different provisions of law had to be punished under the law that provided for the longest possible term of imprisonment. (Former § 654, subd. (a).) Assembly Bill No. 518 amended section 654 by removing the requirement that the trial court impose sentence under the law providing for the longest term of imprisonment and gave the trial court discretion to impose punishment under any applicable provision of law. (Stats. 2021, ch. 441, § 1.) The new legislation became effective on January 1, 2022, while this appeal was pending.

The parties agree that appellant is entitled to the retroactive benefit of Assembly Bill No. 518 and remand for resentencing is required. (*People v. Mani* (2022) 74 Cal.App.5th 343, 379 ["Because Assembly Bill 518 was enacted while defendant's appeal was not yet final and it provides the trial court new discretion to impose a lower sentence, defendant is entitled to its ameliorative benefit"]; *People v. Sek* (2022) 74 Cal.App.5th 657, 673 [same].) Accepting the parties' agreement, we remand the matter for resentencing to allow the trial court to exercise its discretion in imposing sentence on either count 1, the attempted murder of Officer Lopez, or count 2, assault on Officer Lopez with force likely to produce great bodily injury.

Appellant also contends he is entitled to the retroactive benefit of Senate Bill No. 567, effective January 1, 2022, which amended section 1170, subdivision (b) to make the lower term the presumptive sentence for a term of imprisonment under certain

circumstances.[7] (Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(6).) Respondent agrees that section 1170, subdivision (b), as amended by Senate Bill No. 567 applies retroactively in this case. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039 ["the amended version of section 1170, subdivision (b) that became effective on January 1, 2022, applies retroactively . . . as an ameliorative change in the law applicable to all nonfinal convictions on appeal"].)

Accordingly, on remand, the trial court may revisit all of its prior sentencing decisions, including what term to impose under section 1170, subdivision (b), as amended by Senate Bill No. 567. (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"].)

---

[7] Specifically, newly added subdivision (b)(6) of section 1170 provides:

"Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:

"(A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.

"(B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense.

"(C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking."

## II. The Habeas Petition

In reviewing a habeas corpus matter, we presume the correctness of the criminal judgment, for " 'habeas corpus is an extraordinary, *limited* remedy against a presumptively fair and valid final judgment.' " (*In re Reno* (2012) 55 Cal.4th 428, 450, quoting *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1260 (*Gonzalez*).) Thus, " 'the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them' " by a preponderance of the evidence. (*In re Price* (2011) 51 Cal.4th 547, 559, quoting *People v. Duvall* (1995) 9 Cal.4th 464, 474 (*Duvall*).)

The issuance of an OSC following an appellate court's receipt of a petition for a writ of habeas corpus does not "*establish* a prima facie determination that petitioner is entitled to the relief requested." (*In re Serrano* (1995) 10 Cal.4th 447, 455.) Rather, it "signifies the court's *preliminary* determination that the petitioner has pleaded sufficient facts that, *if true*, would entitle him to relief." (*Duvall, supra*, 9 Cal.4th at pp. 475, italics added; *People v. Ruiz* (2023) 89 Cal.App.5th 324, 328–329.)

In response to the OSC, the respondent files a return, alleging facts to justify the petitioner's confinement, and the petitioner answers the return with a traverse. (*Duvall, supra*, 9 Cal.4th at pp. 475–476.) "Once the issues have been joined in this way, the court must determine whether an evidentiary hearing is needed. If the written return admits allegations in the petition that, if true, justify the relief sought, the court may grant relief without an evidentiary hearing. [Citations.] Conversely, consideration of the written return and matters of record may persuade the court that the contentions advanced in the petition lack merit, in which event the court may deny the petition

without an evidentiary hearing." (*People v. Romero* (1994) 8 Cal.4th 728, 739 (*Romero*).)

Here, petitioner alleges he was deprived of effective assistance of counsel on account of the following acts and omissions of his defense counsel: (1) failing to arrange for petitioner to wear civilian clothing during trial and allowing petitioner to appear before the jury without objection in jail clothing; (2) failing to object or otherwise seek to exclude testimony concerning petitioner's possession of a large number of weapons and "antigovernment" books; (3) failing first to investigate an involuntary intoxication and/or "mental health" defense by obtaining petitioner's medical records from his Welfare and Institutions Code section 5150 hospitalization, and then failing to use those records to present a "mental health," unconsciousness, and involuntary intoxication defenses.

"The burden of proving ineffective assistance of counsel is on the defendant." (*People v. Babbitt* (1988) 45 Cal.3d 660, 707 (*Babbitt*).) As set forth above, "[t]o prevail on [his] claim[s], petitioner must prove ' "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant." ' " (*In re Crew* (2011) 52 Cal.4th 126, 150, quoting *In re Roberts* (2003) 29 Cal.4th 726, 744–745.) Again, the probability of a better result "must be substantial, not just conceivable" (*Harrington, supra,* 562 U.S. at p. 112), such that the result of the trial is unreliable or the entire proceeding fundamentally unfair. (*Valdez, supra,* 49 Cal.4th at p. 729.)

## A. Failure to Arrange for Civilian Clothing and Allowing Petitioner to Appear Before the Jury Without Objection in Jail Clothing

Petitioner asserts the same ineffective assistance of counsel claim that he advances on appeal, and the facts alleged in the petition to support the claim are the same as those discussed in the context of the appeal.  The sole factual dispute is whether petitioner appeared before the jury in jail attire for the entire trial or only on the first day.  However, no evidentiary hearing is warranted to resolve this dispute because, as set forth above, petitioner cannot show a reasonable probability that he would have received a more favorable result had defense counsel's performance not been deficient.  (*Strickland, supra,* 466 U.S. at pp. 693–694; *Romero, supra,* 8 Cal.4th at p. 739; *Babbitt, supra,* 45 Cal.3d at p. 708.)  Accordingly, based on our review of the entire record and our conclusion that defense counsel's failures to arrange for civilian clothing or object to petitioner's appearance before the jury in jail attire were not prejudicial, we need not determine whether counsel's performance was deficient in this regard.

## B. Failure to Object and Seek Exclusion of Testimony Regarding Petitioner's Cache of Weapons and Antigovernment Books Under Evidence Code Sections 352 and 1101, Subdivision (b)

Petitioner's claim of ineffective assistance of counsel based on the failure to object and seek to exclude testimony regarding possession of weapons and "antigovernment" books is identical to the ineffectiveness claim he advances on appeal, and lacks merit for the same reasons.  As discussed above, petitioner cannot establish prejudice based on counsel's omission because the

evidence was relevant to the contested issues of motive and intent. And based on the jury's not true finding on the premeditation allegation and its acquittal on the criminal threats charge, petitioner cannot show a reasonable likelihood of a more favorable result had defense counsel sought to exclude the testimony under Evidence Code sections 352 or 1101.

## C. Failure to Investigate and Obtain Petitioner's Medical Records to Support Potential Mental State Defenses

Petitioner asserts defense counsel rendered ineffective assistance of counsel by failing to obtain petitioner's medical records from his Welfare and Institutions Code section 5150 hospitalization, failing to investigate possible "mental defenses" based on those records, and failing to use the exculpatory evidence in the medical records to support unconsciousness, involuntary intoxication, and other mental-health-related defenses.

It is undisputed that defense counsel did not obtain the medical records from petitioner's Welfare and Institutions Code section 5150 hospitalization. However, this fact alone does not establish deficient performance by counsel. Even in a death penalty case, "[c]riminal trial counsel [has] no blanket obligation to investigate possible 'mental' defenses." (*Gonzalez, supra,* 51 Cal.3d at p. 1244; *People v. Klvana* (1992) 11 Cal.App.4th 1679, 1712.) To prevail on his claim that trial counsel's investigative omission amounted to constitutionally inadequate assistance, " ' "[t]he petitioner must demonstrate that counsel knew or should have known that further investigation was necessary, and must establish the nature and relevance of the evidence that counsel failed to present or discover." ' " (*In re Cox* (2003) 30

Cal.4th 974, 1016.)  Thus, even assuming defense counsel did not adequately investigate possible mental health defenses, "petitioner must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937; *People v. Orloff* (2016) 2 Cal.App.5th 947, 956.)

To establish prejudice based on trial counsel's incompetent investigation or presentation of evidence, the petitioner must also demonstrate that the undiscovered evidence would have been exculpatory.  (*People v. Bolin* (1998) 18 Cal.4th 297, 334; *In re Noday* (1981) 125 Cal.App.3d 507, 522.)  The reviewing court must then determine the strength of any evidence trial counsel could have discovered with reasonable investigation and the strength of the evidence presented at trial.  (*In re Thomas* (2006) 37 Cal.4th 1249, 1265.)

Here, petitioner asserts that the medical records contained exculpatory evidence that would have negated specific intent.  In particular, the medical records submitted as an exhibit in support of the petition show a positive drug test for cannabinoids and benzodiazepines, a diagnosis of "Brief Psychotic Disorder" with a note to "[rule out] substance induced Psychosis," and multiple references to "severe psychotic features including delusions."  The July 31, 2017 assessment specifically states that petitioner presented with "acute episode of psychosis . . . after ingesting unknown substance (suspicious for Spice)."  The medical records also note periodic "religious hallucinations," a preoccupation with religion, "command hallucinations," "altered awareness of immediate physical environment," and "severe psychotic features including delusions" that "he is God and everyone needs to bow down to him."

41

Finally, the follow-up psychiatry consultation notes dated August 2, 2017, contain the following description of petitioner: "[Patient] presents very intense, angry [with] psychotic features. [Patient] when asked what started the fight that brought him into the hospital states, 'IT controlled those actions, IT DID! IT DID! It is from below, far below many layers!' [Patient] states 'THE LORD, GOD, COMMUNICATES THROUGH ME AND YOU SHOULD ALL BOW TO YOUR F***ING KNEES!' 'THIS ONE IS UNDER HEAVEN, IS THE CHOSEN KING!' [Patient] remains very intense, aggressive [with] severe psychosis and psychotic agitation. [Patient] has been noticeably responding to internal stimuli and endorsing auditory hallucinations as well as delusions that he is all powerful, he is God, and that he is controlled by God and 'others.' [Patient] is very labile, starting the interview calmly then becoming loud [with] intense eye contact, changing his voice and banging his hand against side of bed. [Patient] remains an imminent danger to himself, others and is gravely disabled at this time."

Petitioner has submitted more than 200 pages of medical records in support of his claim of ineffective assistance of counsel. But missing from the exhibits in support of the petition is any sworn statement from a mental health expert or one of the physicians who examined and treated petitioner interpreting the medical records or explaining their significance in relation to petitioner's mental state at the time of the offenses in this case. In the absence of any such expert opinion, the information in petitioner's medical records does not provide exculpatory evidence that would negate the possibility that petitioner formed the requisite specific intent for his crimes. In short, petitioner's medical records from his Welfare and Institutions Code section

42

5150 hospitalization—standing alone—do not establish petitioner was prejudiced by trial counsel's failure to obtain the medical records and use them to support unconsciousness, involuntary intoxication, and other mental-health-related defenses.

In analyzing the issue of prejudice from trial counsel's failure to obtain petitioner's medical records, we must also consider the evidence presented at trial to support the claim that petitioner's mental state prevented him from forming the specific intent necessary for conviction. In this regard, the medical records contained no information that was not presented to the jury at trial:

(1) Manuele testified petitioner was groggy and unresponsive on the day of the incident, and she believed he was on drugs. Petitioner admitted using "[a] little marijuana" the day before the incident, explaining that it usually makes him feel calm, and the CBD helped to prevent seizures. But on this day, petitioner described his "general state at the time [as] complete inebriation/toxicity." Petitioner testified that throughout the incident he "was in and out of consciousness," and only remembered parts of the events that day. He stated he did not recognize Terrill as his son, nor did he recognize any of the responders as police officers or emergency personnel.

(2) Before physically attacking his son, his best friend, and his mother, petitioner screamed that "everybody has to die," and "anyone who doesn't bow down to the God will be killed." According to Terrill, petitioner "sounded like a deranged, crazy man."

(3) When the first officer arrived on the scene, petitioner was yelling that "he was God," as he was being held down, naked, on the ground. The officer believed petitioner's mental state

43

made him a danger to others, and decided to place him on a mental health hold pursuant to Welfare and Institutions Code section 5150.  Later, as petitioner was kicking and punching police officers and emergency personnel, he was shouting, " 'I'm God.  Bow down to me.'  His eyes were bloodshot, almost like they were bleeding."

All of this information supported petitioner's claim that he could not and did not form the requisite specific intent for any of the charged offenses.  Nevertheless, the jury still found that petitioner had the necessary specific intent to convict him of attempted murder and attempted criminal threats.  The jury also rejected petitioner's statements that he did not recognize his son or realize the people he was attacking were police officers.  Accordingly, there appears no reasonable likelihood of a more favorable outcome had the jury been presented with the information contained in petitioner's medical records.

**DISPOSITION**

The judgment of conviction is affirmed. The matter is remanded to the trial court with directions to stay the sentence on either count 1 or count 2 in accordance with Penal Code section 654 as amended by Assembly Bill No. 518. On remand, the trial court may also revisit all of its prior sentencing decisions, including what term to impose under Penal Code section 1170, subdivision (b), as amended by Senate Bill No. 567.

The order to show cause is discharged and the petition for a writ of habeas corpus is denied.

NOT TO BE PUBLISHED.


                                        LUI, P. J.

We concur:



CHAVEZ, J.



HOFFSTADT, J.